**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HOOTERS OF AMERICA, LLC; | Case No:  1:19-CV-390 |
| Plaintiff, | |
| v. | |
| TYSON FOODS, INC.; TYSON CHICKEN, INC.; TYSON BREEDERS, INC.; TYSON POULTRY, INC.; PILGRIM'S PRIDE CORPORATION; HOUSE OF RAEFORD FARMS, INC.; MAR-JAC POULTRY, INC.; MAR-JAC POULTRY MS, LLC; MAR-JAC AL/MS, INC.; MAR-JAC POULTRY, LLC; MAR-JAC HOLDINGS, LLC; PERDUE FARMS, INC.; and PERDUE FOODS, LLC, | |
| Defendants. | |

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................................ 1

    A.  Defendants Unlawfully Agreed to Curtail the Supply of Chicken ........................ 2

    B.  Defendants Unlawfully Agreed to Manipulate and Artificially Inflate the Georgia Dock ................................................................................................................. 5

II. PARTIES ......................................................................................................... 8

    A.  Plaintiff ...................................................................................................... 8

    B.  Defendants .................................................................................................. 8

    (i)  The Tyson Defendants ................................................................................. 8

    (ii)  Pilgrim's Pride Corporation ......................................................................... 9

    (iii)  House of Raeford Farms, Inc. ....................................................................... 9

    (iv)  Mar-Jac Poultry, Inc. ................................................................................. 10

    (v)  The Perdue Defendants ............................................................................... 11

III. JURISDICTION AND VENUE ........................................................................ 11

IV. TRADE AND COMMERCE ............................................................................ 13

    A.  Background on the Broiler Chicken Market .................................................... 13

    B.  The United States Broiler Market is a National Market Comprising Tens of Billions of Dollars' Worth of Annual Sales ................................................... 14

V.  FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL CONSPIRACY ............................................................................................... 16

    A.  Overview of Defendants' Illegal Conspiracy ................................................. 16

    B.  Agri Stats Participated in, and Actively Facilitated, Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce the Conspiracy ................................................................................ 19

    C.  Agri Stats' Detailed Reports Enable Defendants to Accurately Assess and Monitor Their Competitors' Production Levels and Breeder Flocks .................. 25

    (i)  Agri Stats' Critical Role in the Chicken Industry .......................................... 28

    (ii)  Defendants' Public Statements Show the Relevance of Agri Stats' Data to their Collective Efforts to Cut Production ............................................................. 31

    D.  Defendants' Conspiracy Artificially Increased and Maintained Chicken Prices .. 34

(i)        The State of the U.S. Chicken Market Prior to the Conspiracy – 2007 ............... 34

(ii)       Defendants Depart from Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts Beginning in 2008 ........................................ 36

   (a)    Defendant and their co-conspirators' Executives Publicly Decry the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary ........................................................................................................... 38

   (b)    Defendants Begin to Cut Production in Concert................................................... 40

   (c)    Defendants' Chicken Production Cuts, from 2008 to Early 2009, Included Unprecedented Reductions to Chicken Breeder Flocks.................................................. 50

   (d)    Defendants' Conspiracy, Hatched in the Great Recession Continued into 2011 With Another Round of Collective Production Cuts ........................................... 52

   (e)    Drastically-Reduced Breeder Flocks Boost Chicken Prices and Raise Defendants' Profits to Record Levels........................................................................................ 63

(iii)      Collusively Manipulating the Georgia Dock Benchmark Price Index ................ 72

   (a)    Overview of the Georgia Dock, USDA Composite, Urner Barry, and EMI Chicken Price Indices ........................................................................................... 72

   (b)    The Georgia Dock Pricing Methodology and Its Susceptibility to   Manipulation 74

   (c)    Georgia Dock Prices Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2013 ......................................................................... 84

   E.    The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion ...................................................................................... 86

(i)        Highly-Concentrated Market with Vertically-Integrated Producers.................... 86

(ii)       The Market for Broilers is Characterized by Inelastic Supply and Demand ........ 89

(iii)      There are no Significant Substitutes for Broiler Chickens .................................. 90

(iv)       The Broiler Industry Has Experienced High Consolidation and is Highly Concentrated ...... 90

(v)        The Broiler Industry Has a History of Government Investigations and Collusive Actions. 92

(vi)       Existence of Numerous Trade Associations and Access to Competitors' Data Through Agri Stats............................................................................................... 94

(vii)      High Barriers to Entry..................................................................................... 100

(viii)     Defendants Have Similar Cost Structures and Work Collaboratively to Share Cost Information ........................................................................................... 102

   F.    Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy ...................................................................................................... 104

(i)        A Collective Shift Away from Long-Term Fixed-Price Contracts.................... 104

(ii)       Inter-Defendant Sales........................................................................... 106

(iii)      Atypical Increases in Defendants' Exporting of Chickens ................................. 108

G.       The Statute of Limitations Does Not Bar Plaintiff's Claims ............................. 109

(i)       Plaintiff Did Not Discover (and Could Not Have Discovered) the Conspiracy Until 2016 ........................................................................................................ 109

(ii)      Defendants Actively Concealed Their Conspiracy............................................. 111

(iii)     Plaintiff's Claims Were Tolled by the Direct Purchaser Class Action Complaint Filed in 2016 ...................................................................................................... 114

VI.   ANTITRUST IMPACT ......................................................................................... 114

VII.  VIOLATION OF THE SHERMAN ACT .............................................................. 115

COUNT I        VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS FOR OUTPUT RESTRICTION AND PRICE-FIXING)................................... 115

COUNT II       VIOLATION OF 15 U.S.C. § 1 (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION – PLED IN THE ALTERNATIVE TO COUNT I) ....................................................................... 116

COUNT III      VIOLATION OF 15 U.S.C. § 1 (AGAINST DEFENDANTS PILGRIM'S PRIDE, TYSON, PERDUE & MAR-JAC     FOR PRICE-FIXING – PLED IN THE ALTERNATIVE TO COUNT I) ........................................... 117

VIII. PRAYER FOR RELIEF ......................................................................................... 119

Plaintiff Hooters of America, LLC, ("Hooters of America" or "Plaintiff") brings this action against the Defendants identified below for Defendants' illegal conspiracy which increased the prices of chicken sold in the United States. Plaintiff brings this action for treble damages under the antitrust laws including Section 1 of the Sherman Act, against Defendants. Plaintiff demands a trial by jury in which it will seek treble damages from Defendants, who are jointly and severally liable, for Plaintiff's purchases of chicken from at least as early as 2008 through at least as late as 2016.

## I.     NATURE OF THE ACTION

1.     This is a case about some of America's chicken producers reaching illegal agreements and restraining trade beginning at least as early as 2008 through at least as late as 2016 (generally referred to herein as the "relevant period"). Through those unlawful agreements, Defendants successfully implemented supra-competitive chicken prices to Plaintiff and other purchasers throughout the United States.

2.     Defendants' restraint of trade was implemented through two mechanisms. The first focused on the beginning of the distribution chain by reducing the supply of broiler chickens into the market. The second focused on the end of the distribution chain by manipulating price indices with respect to wholesale chicken prices for buyers such as Plaintiff, who purchased affected products directly from the Defendants and their affiliates.

3.     One of the participants in the alleged conspiracy, Fieldale Farms, has already agreed to pay $2.25 million to settle claims by a putative class of direct purchasers alleging that Fieldale Farms participated in this conspiracy. Moreover, the Antitrust Section of the Florida Attorney General's office is currently investigating the industry for anticompetitive practices.

A.    **Defendants Unlawfully Agreed to Curtail the Supply of Chicken**

4.    Broiler chickens constitute approximately 98% of all chicken meat sold in the United States.  Defendants are among the leading suppliers of chicken in an industry with over $30 billion in annual wholesale revenue, and are among those who control approximately 90% of the wholesale chicken market.  The industry is highly concentrated, with a small number of large producers in the United States controlling supply.

5.    One aspect of Defendants' scheme curtailed the supply of chickens in the market via unprecedented cuts at the top of the supply chain in the form of collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption.  Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production – at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants – but which still allowed them to ramp up production within weeks if chicken prices increased.

6.    Historically, the chicken industry was marked by boom and bust cycles where, in response to rising prices, producers increased production, which caused an oversupply and resulting decrease in pricing.  However, that market pattern changed markedly in 2008.  By their wrongful conduct as alleged in this complaint, Defendants not only materially reduced or eliminated the historical boom and bust cycle of the chicken industry, they propped up chicken prices during periods of rapidly falling input costs by, among other means, coordinating supply restrictions and manipulating one or more Broiler price indices.

7.    The historic pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry refrain was that the market would grow by 3% more broilers per year.  A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it

2

never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before. WATT POULTRYUSA 2008 rankings data show the industry's total weekly ready-to-cook (RTC) production at 724.05 million pounds, just slightly more than the 723.71 million RTC pounds per week reported at the end of 2007."

8.      In 2008, faced with dropping prices and low profits, Defendants collectively began cutting their ability to ramp up production by materially reducing their breeder flocks. While in the past, Defendants undertook traditional, short-term production cuts, this was a significant shift in their behavior. Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the current decade – effectively eliminated their ability to meaningfully increase supply for years.

9.      Defendants' joint efforts to impose supply-side "discipline" included public statements by their senior executives about a Defendant's individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" within the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice.

10.     Defendants' coordinated output restriction scheme was successfully facilitated by, monitored and policed, using reports purchased at significant cost, from Agri Stats, Inc. ("Agri Stats"), which in 2013 became a subsidiary of global pharmaceutical company Eli Lilly & Co. Agri Stats collects detailed, proprietary data from all Defendants, including housing used, breed of chicks, average size, and production and breeder flock levels. Although certain Defendants had used Agri Stats before 2008, the output-restriction part of Defendants' conspiracy began

when Defendant Tyson Foods – which had stopped using Agri Stats sometime in the mid- 2000s – became a subscriber again in early 2008.

11.     While the Agri Stats reports superficially "anonymize" individual producer information, they are sufficiently detailed so that any reasonably informed producer may discern the identity of its competitors' information, including breeder flocks, and other production, capacity and cost data.  Agri Stats, as detailed below, plays both a unique role in the chicken industry and an important role in the conspiracy alleged here, by willfully enabling Defendants to know what each of them were doing in furtherance of the concerted action among the producers.

12.     The information available to Defendants in these Agri Stats reports is not the kind of information that, in a competitive market, would be disclosed by one competitor to another.  Agri Stats reports include individual lines (sometimes called "rows") of facility-level data for over 100 of Defendants' chicken integrated production facilities.  Most of these vast facilities, referred to as "complexes," include housing for Defendants' breeder flocks and hatcheries where breeder flock hens lay the eggs that will ultimately become the chickens sold to the market.

13.     The Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.  For example, "Region 20" includes "Sub-Region 21 – Upper Mid Atlantic," identifying, with a unique number, sixteen chicken complexes, including but not limited to, four Tyson complexes, four Perdue complexes, two Pilgrim's Pride complexes, and one George's complex.[1]

---

[1] Agri Stats reports also include specific data for Defendants' chicken complexes (listed by producer and location) in:  North Carolina ("Sub-Region 22"); Northern Georgia and Tennessee ("Sub-Region 31"); Southern Georgia,

14. Agri Stats' reports are not publicly available and Defendants closely guard the reports' contents and the degree of Defendants' participation in Agri Stats' data-gathering and data-dissemination processes. Defendants have reported detailed data to Agri Stats on a regular basis (usually weekly).

15. Agri Stats both facilitated and participated in the conspiracy because, among other things:

- Agri Stats' coding system enabled Defendants' personnel to decipher, simply by eyeballing the "rows" in a given report, the production, feed, sales and other competitively-sensitive metrics of their competitors, many of whom had complexes "right down the road from" each other in the same Agri Stats sub-region;

- Agri Stats' regular meetings with each Defendant allowed Agri Stats to share production information among the Defendants. For example, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' production following quarterly meetings between the Tyson complex managers and Agri Stats account managers; and

- Agri Stats account managers created, for each of their Defendant customers, a series of data compilations known as "books," based on the competitively-sensitive data that one alleged conspirator had submitted to Agri Stats. On a number of occasions, Agri Stats personnel sent copies of one alleged conspirator's "books" to other alleged conspirators.

**B.    Defendants Unlawfully Agreed to Manipulate and Artificially Inflate the Georgia Dock**

16. A second aspect of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Georgia Department of Agriculture (the "GDA"). Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price is a self-reported number from a group of at least ten chicken producers

---

Florida and South Carolina ("Sub-Region 32"); Alabama and Mississippi (sub-regions 41 and 42); lower Arkansas, Louisiana and Texas ("Sub- Region 51"); upper Arkansas and Missouri ("Sub-Region 52"); Kentucky, Ohio, Minnesota, Indiana and Wisconsin ("Sub-Region 60"); and California and the Pacific Northwest ("Region 10") (which is composed solely of Defendant Foster Farms' three complexes).

5

(Defendants Pilgrim's Pride, Tyson, Perdue, Mar-Jac, and co-conspirators Fieldale Farms, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, and Wayne Farms). Senior executives from eight of the ten companies who participated in the Georgia Dock price submission prices (hereinafter, the "Georgia Dock Conspirators") were members of a private sector "Georgia Dock Advisory Board," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.

17. Following intense scrutiny – first in mid-2016 from the U.S. Department of Agriculture ("USDA"), and then by the press, which in late 2016 first revealed the easily manipulated methodology used to create the Georgia Dock benchmark price – the GDA, on November 28, 2016, suspended reporting the Georgia Dock benchmark price. The GDA considered implementing new price-reporting requirements, including the submission of an affidavit by each Georgia Dock Conspirator vouching for the accuracy of their submitted price inputs. However, the Georgia Dock Conspirators balked at these new rules, so in late November 2016, the GDA stopped publishing the Georgia Dock benchmark index altogether, citing a "lack of submissions" under the new reporting requirements.

18. The November 23, 2016 Georgia Dock benchmark whole-bird price of $1.0975/lb. was the last one reported by the GDA. The GDA later introduced a new index called the "Georgia Premium Poultry Price Index," which purported to be a more transparent, accurate, and verifiable pricing mechanism – but abandoned the new index in February 2017 due to a lack of participation by chicken producers. The Antitrust Section of the Florida Attorney General's office is currently investigating the chicken industry for anticompetitive practices, including the manipulation of the Georgia Dock.

19.    Defendants' conduct has led to public reports of Defendants' anticompetitive behavior.  For instance, stock market analysis service Seeking Alpha reported in November 2016, in an article titled "*Evidence Of Chicken Price Manipulation:  The Curious Case Of The Georgia Dock*," that the chicken companies (including Pilgrim's Pride, Tyson, and Sanderson) "may be manipulating the Georgia Dock price index in order to receive a much higher price than real market prices."  Seeking Alpha noted that Defendants' conduct surrounding this price index manipulation "has accounted for >100% of earnings for pure-play chicken companies recently." The alleged unlawful conduct was so serious that Seeking Alpha projected among other things, "60% downside for [Pilgrim's Pride], [and] 40% downside for [Tyson]" upon correction of their behavior, before any "potential penalties."  The result of the "potential LIBOR-rigging type scandal," Seeking Alpha reported, was that "US consumers have been over-charged for chicken by more than $3 billion per year" and that major chicken producers were "significantly over-earning as a result of what may be a manipulated price index."

20.    Defendants' conspiracy was instigated in a market with numerous characteristics making it highly susceptible to collusion, including:  (a) a highly-concentrated market dominated by vertically-integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for producers to conspire through a number of regularly scheduled trade association meetings; and (f) access to competitors' data through Agri Stats. Indeed, the chicken industry has the hallmarks of an industry susceptible to collusion, including high consolidation, predictable demand in a commodity market, and routine, public display of prices to deter deviation from the collusive behavior.

## II.     PARTIES

### A.     Plaintiff

21.     Plaintiff Hooters of America, LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Hooters of America, through its affiliates, owns and operates restaurants that sell chicken. Hooters of America brings this action on its own behalf and, alternatively, as assignee of its purchasing agents who assigned their claims to Hooters of America (including Naturally Fresh, Inc. and Ben E. Keith). During the time period relevant to Plaintiff's claims, Hooters of America and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

22.     The reference in this Complaint to "Plaintiff" refers collectively to Hooters of America, LLC and its assignors.

23.     Hooters of America is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

### B.     Defendants

#### (i)     The Tyson Defendants

24.     Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.

25.     Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

26.     Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

27.     Defendant Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.

28.     Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint.  Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of four Defendants in this action, that submitted false and artificially inflated price quotes to the GDA.  One of its plant managers served on the Georgia Dock Advisory Board.  Tyson is a Georgia Dock Conspirator.

                    (ii)     Pilgrim's Pride Corporation

29.     Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a publicly held Delaware corporation headquartered in Greeley, Colorado.  Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky.   Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the four Defendants that submitted false and artificially inflated price quotes to the GDA.  Its executive vice president of sales and operations served on the Georgia Dock Advisory Board.  Pilgrim's Pride is a Georgia Dock Conspirator.

30.     Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.

                    (iii)     House of Raeford Farms, Inc.

31.     Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.

(iv)     Mar-Jac Poultry, Inc.

32.     Defendant Mar-Jac Poultry, Inc. ("Mar-Jac") is a Delaware corporation headquartered in Gainesville, Georgia.

33.     Defendant Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Gainesville, Georgia.

34.     Defendant Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia.

35.     Defendant Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia.

36.     Defendant Mar-Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar Jac Poultry MS LLC, Mar-Jac AL/MS, LLC, and Mar-Jac Poultry, LLC.

37.     Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac" in this Complaint.  Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the four Defendants that submitted false and artificially inflated price quotes to the GDA.  Its vice president of operations served on the Georgia Dock Advisory Board.  Mar-Jac is a Georgia Dock Conspirator.

(v)    The Perdue Defendants

38.    Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.

39.    Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.

40.    Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint.  Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.  Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Perdue was one of the four Defendants that submitted false and artificially inflated price quotes to the GDA.  Perdue is a Georgia Dock Conspirator.

## III.    JURISDICTION AND VENUE

41.    This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' conspiracy to restrain trade.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

42.    Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

43.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

44.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S., including in this District. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.

45.     This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken sold in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark.  The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.

## IV.    TRADE AND COMMERCE

### A.    Background on the Broiler Chicken Market

46.    Broiler chicken (referred to either as "Broilers" or "chicken" in this complaint) refers to chicken raised for meat consumption to be slaughtered before the age of 10-13 weeks.[2] Broiler chicken can be sold fresh or frozen, raw or cooked, or whole or in parts, but as used in this complaint the term excludes chicken grown, processed and sold according to halal, kosher, free-range, or organic standards. According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of Defendant Pilgrim's recently commented that "the chicken business per se is a commodity business." The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant time period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.

47.    Typically, when a product is characterized as a commodity, competition is based principally on price – as opposed to other attributes, such as product quality or customer service. Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.

48.    Due to the lack of product differentiation, Defendants are forced to compete on price (absent collusion) such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole. Thus, the commodity nature of the product in the chicken industry

---

[2] On January 1, 2014, the USDA's Food Safety and Inspection Service ("FSIS") implemented a final rule lowering the age definitions for broilers/fryers from 13 weeks to the current 10 weeks. *See* 9 C.F.R. 381.170 (2014) (also noting that "FSIS is not establishing separate definitions for 'broiler' and 'fryer' chickens in this final rule").

makes it easier to implement a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.

49.     During the relevant period, Defendants and their co-conspirators collectively controlled nearly 90% of the market for chicken in the United States.  Indeed, Tyson alone controlled such a significant portion of the industry that it often would demand that entities like Hooters purchase additional products if they wanted to purchase chicken from Tyson. The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the supply chain:  breeding, hatching, chick-rearing/feeding, slaughtering mature birds, processing, and selling.  At the top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.

**B.     The United States Broiler Market is a National Market Comprising Tens of Billions of Dollars' Worth of Annual Sales**

50.     According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013.  The market value varied between $21.8 and $30.7 billion from 2008-2013.

51.     There is a single national market for Broilers in the United States.  Prices for Broilers sold in the United States are quoted in whole bird or disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

52.     About 50-70% of Broilers are sold under contract with a customer, about 10-20% are sold on the spot market, and roughly 17-20% are exported.

53.     Exports of Broilers from the United States account for approximately 45% of all United States meat exports.  Broilers produced in the U.S. are exported to well over 100 different

14

countries, with the major export markets including Mexico, Canada, Hong Kong, and China. Some of the exports from the United States include products less desirable to United States consumers, such as chicken feet or dark meat, but exports also increasingly include white meats and other products widely consumed in the United States.

54. Exports of Broilers from the United States have increased since 2007 both in quantity and value. In 2006 exports constituted only 14.8% of U.S. exports and increased to 16.5% by 2007. But between 2008-2014 export levels were never lower than 18.5% of U.S. production levels, dropping down to 16% in 2015 due to export bans by countries due to Avian Flu concerns.

55. While this Complaint does not seek damages for Broilers sold into export commerce, Broilers exported from the United States decrease available supply and increase Broiler prices in the United States. Therefore, exports by Defendants were a mechanism used by Defendants to affect their United States-based Broiler market conspiracy.

56. The prices for certain of Defendants' chicken sales were based on benchmark price indices, including the Georgia Dock whole-bird price, which was one of three benchmark price indices used by chicken buyers until early 2017.

57. Defendants' conduct, as described in this Complaint, was within the flow of, intended to, and did have a substantial effect on, the interstate commerce of the U.S., including in this District.

58. During the relevant period, Defendants produced, sold and shipped chicken in a continuous and uninterrupted flow of interstate commerce. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in Illinois.

15

59.     During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

## V.    FACTUAL ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL CONSPIRACY

### A.    Overview of Defendants' Illegal Conspiracy

60.     In 2007, Pilgrim's, Tyson, and other chicken producers attempted to cut their production levels enough to cause industry prices to rise.  However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other Broiler companies increased their production.

61.     As a result, in January 2008, Pilgrim's and Tyson changed tactics, seeking broader cooperation among major producers in the Broiler industry to increase prices.  In January 2008, both Pilgrim's and Tyson publicly stated to the chicken industry that neither Pilgrim's nor Tyson would continue to cut production. A few days after attending an industry event in late January 2008, Tyson's CEO announced Tyson would be raising prices because "we have no choice [but] to raise prices substantially."  A day later, a Pilgrim's executive announced publicly that Pilgrim's would be cutting its production and "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

62.     The other Defendants soon joined Pilgrim's and Tyson's plan, making substantial cuts to their own production.

63.     Defendants went further, however, cutting their ability to ramp up production for *18 months or more* by destroying breeder hens which are responsible for supplying the eggs Defendants raise into chicken.  This destruction of breeder hens was unparalleled and the consequences reverberated in the chicken industry for many years.  Further, when some Defendants in 2010 became "undisciplined" and began gradually increasing their production,

16

Defendants coordinated a second wave of production cuts in 2011 and 2012, which included further substantial destruction of industry breeder flocks. Defendants continued to limit the United States chicken supply in subsequent years by destroying eggs, relying upon one another's production to meet customer needs, and exporting excess breeder flocks to Mexico, even when doing so was against their independent economic interest.

64. The consequence of Defendants and their co-conspirators' cuts in 2008 and 2011-2012 has been a nearly 50% increase in wholesale chicken prices since 2008, by one measure, despite input costs (primarily corn and soybeans) *falling* roughly 20% to 23% over the same time period. The rise in chicken prices relative to input costs has led to record profits for Defendants.

65. To effectuate their conspiracy, Defendants turned to a modernized version of an antitrust conspiracy from the 1970s. During the 1970s, major chicken producers held a weekly conference call to discuss production levels and prices for chicken. After the U.S. Department of Justice ("DOJ") and civil antitrust plaintiffs sued, that practice was suspended.

66. However, by January 2008, modern technology provided a way for Defendants to share detailed production and pricing information and coordinate without industry-wide conference calls. Producers now electronically transfer vast amounts of production data to Agri Stats which, while supposedly anonymous, in fact provides Defendants with sufficient detail to determine with reasonable accuracy producer-level data on production, cost, and general efficiencies. This permits the Defendants to share, on a weekly and/or monthly basis, their confidential production and pricing information, including forward-looking production information, which is easily forecasted on Broiler breeder flock data that is reported and shared.

67. From late 2014 into 2016, chicken input costs fell significantly. Economic theory predicts that in a competitive market, all else being equal, chicken prices similarly would fall.

17

However, prices remained artificially inflated due to the Defendants' agreement to artificially restrict production and their manipulation of the Georgia Dock Broiler price index, published by the Georgia Department of Agriculture ("GDA"). The facts surrounding this episode were unknown to Plaintiff and the public until November 2016, when it became public that the United States Department of Agriculture ("USDA") had requested in July 2016 that the GDA investigate and verify the accuracy of the Broiler prices provided to the GDA by several Defendants. When the GDA declined to do so, citing the industry's and its own lack of interest in verifying prices, USDA began publishing its own chicken price statistic.

68.     "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. There are numerous "plus factors" in the chicken industry during the relevant period including, but not limited to, the following: (a) extensive information sharing through Agri Stats and other means, (b) numerous opportunities to collude in a variety of forums, (c) a coordinated change from contracts with fixed chicken prices to chicken prices that float with the chicken spot market, (d) inter-Defendant trades and purchases that often are against independent self-interest, and (e) multiple industry characteristics which facilitate collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken, and a history of government investigations and collusive conduct.

69.     Defendants' restriction of the chicken supply had the purpose and effect of increasing prices to Plaintiff and other purchasers nationwide. First, as Defendants themselves acknowledge, supply and demand in the chicken industry are inelastic. Therefore, a coordinated decrease in supply as alleged in this Complaint, all else equal, necessarily will result in an

increase in Defendants' revenues (and profits). As one industry consultant, Professor Michael Dicks, noted, "[b]ecause of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

70. Second, as acknowledged by industry experts and Defendants themselves, pricing in virtually all chicken sales is tied to spot market prices, which are publicly known and available through industry price indices. For example, expert economist Dr. Colin A. Carter from the University of California (Davis) has testified in another matter that the business records of Defendants and their customers show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices.

71. Defendants knew and intended that their coordinated limitation and reduction in chicken supply would artificially increase all chicken prices – for spot market and contract sales – above the level they would have been absent the conduct alleged in this Complaint.

**B.    Agri Stats Participated in, and Actively Facilitated, Defendants' Communications Among Themselves, and Provided Data Necessary to Effectuate, Monitor and Enforce the Conspiracy.**

72. The USDA and various other entities publish aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry. But only Agri Stats receives from individual Defendants, and then provides to all other Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency. Agri Stats collects and aggregates chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:

- Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;

19

- Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

- Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (*i.e.*, "down time"), feed conversion rate (pounds of feed per pound of chicken), average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;

- Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;

- Inventory levels of chickens; and

- Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.

73.     Agri Stats collects data from Defendants, audits and verifies the data, and ultimately reports back to Defendants, detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks.   Agri Stats' survey methodology involves direct electronic data submissions from – and to – Defendants of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis.   At each of Defendants' chicken complexes, certain employees, typically in the accounting department, are responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system.   Agri Stats uses a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats' subscribers.

74.     Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."  Sanderson Farms CEO Joe Sanderson claimed "[w]e use Agri Stats, which some of you are probably familiar with.  Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well.  And we get the data back.  It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

75.     However, contrary to these assertions, Defendants can (and do) readily determine "whose numbers the numbers belong to."  Indeed, each Defendant knows that when it provides its internal, confidential information to Agri Stats, the other producers will be able to access that information and identify the Defendant that submitted it.  Providing this specific, competitively-sensitive information to Agri Stats constitutes an unreasonable, anticompetitive restraint of trade, as does Agri Stats' dissemination of the information in the detailed, readily-decipherable form in which it is sent to Defendants.

76.     Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power.  Price-fixing or output- restriction conspiracies, regardless of industry, are subject to inherent instability in the absence of policing mechanisms.  This is because each individual member has the incentive to "cheat" other conspiracy group members.  They can do so, for example, by boosting chicken production to capture higher prices even as other producers heed their conspiratorial duty to limit production.  This actually happened in the chicken industry, but only for a short period in 2010. And the Defendants' conspiracy temporarily faltered in that brief time period.

21

77.     But Agri Stats knowingly participated in the producer Defendants' efforts to prevent such cheating.  Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Defendant, and routine participation in trade association events widely attended by Defendants' senior executives – serve a monitoring function, allowing each member of Defendants' conspiracy to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

78.     Defendants rarely mention their proprietary, privileged, and confidential exchange of information with one another through Agri Stats.  However, on occasion, Broiler producers have provided glimpses into their use of Agri Stats information.  For instance:

- Sanderson Farms reported in May 2008 that "every year we review our operations and every facet within Agristats … we set operational goals every year ...  and [we] try to improve our operations within this benchmarking service we call Agristats."

- Sanderson Farms CEO Joe Sanderson commented on a December 2009 earnings call that "my judgment is that based on what I see in Agr[i] stats nobody is planning on, pullet placements say no ramp up and what I've gleaned from Agr[i] stats, people are not planning on ramping up.  I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."

- Sanderson Farms CEO Joe Sanderson commented in a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."  Asked later on the call by an analyst why he had said on the call and a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Sanderson indicated "industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now....  And then once you get past July 4 ... I think then you will start seeing reduced egg sets....  Typically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January."

- Tyson Foods noted in a December 2014 investor presentation that "[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be."

79.     Similar to Defendants, Agri Stats on occasion refers to the secret exchange of information it facilitates among Defendants and their co-conspirators. In many instances, Agri Stats has played the role of industry cheerleader rather than industry benchmarking service, with Agri Stats suggesting specifically how much Broiler production should be cut based on Agri Stats data.

- In July 2012, trial testimony in a lawsuit filed by contract farmers against Pilgrim's revealed that a November 2008 Agri Stats report "made statements to the effect that it thought the industry was 5-percent oversupplied ... relative ... to demand."

- Agri Stats holds regular "poultry outlook conferences" for meat industry executives. For instance, Agri Stats hosted an April 23, 2015, conference in Atlanta, Georgia for which an agenda indicated a presentation by Agri Stats Vice President Sue Trudell would be provided concerning the "broiler market situation and outlook" and an analysis of feed and macroeconomic factors. Such presentations are restricted from circulation outside the invited participants to the conference and are not publicly available.

- Sanderson Farms invited Agri Stats employees to present about the industry to Sanderson's own investors, such as an October 18, 2013, presentation by Agri Stats Vice President Sue Trudell.

- In January 2009 Agri Stats Vice President Mike Donohue commented that "We [i.e., Broiler producers] are an industry that is in demand.... We have a product that people want and continue to consume."

- Agri Stats subsidiary EMI also holds regular invitation-only "Analytics Web Conference" calls.

- Agri Stats Vice President Donohue also frequently appears at industry events, such as the Spring 2011 IPE conference. Donohue provided

comments as part of an annual "market intelligence" forum about various industry performance metrics. Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011.

- Donohue also authors articles for the Agri Stats publication EMI Vital Signs. For instance, the sole "sample" publication available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzes whether Broiler producers could continue to achieve high profit levels. Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

- Donohue helps forecast supply and demand for the Broiler industry by using Agri Stats data on breeder placements and inventory. For instance, at the US Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012," he said. "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories." Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again," but noted that Agri Stats data indicates the industry is slaughtering breeder flocks at 59 to 60 weeks (instead of the typical 65 weeks), which suggested to him the industry was managing its production carefully.

80. One Broiler industry expert testified in a case brought by contract farmers against chicken producers that the sharing of information through Agri Stats by Broiler producers regarding pay for contract-farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting "[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and

oligopsonistic [sic] behavior far more complex and advanced than available for any other agricultural industry.  An intensive inquiry is needed."

### C.    Agri Stats' Detailed Reports Enable Defendants to Accurately Assess and Monitor Their Competitors' Production Levels and Breeder Flocks

81.    Agri Stats claims to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by a number.  But Agri Stats reports are so detailed that any reasonably-informed producer can easily discern the identity of its competitors' individual chicken complexes.  It is common knowledge among producers (and Agri Stats) that others can do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

82.    As described above, Agri Stats reports identify each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.  Specific complexes are easily identifiable from their codes.  Agri Stats' coding system made it easy for Defendants and their co-conspirators' employees – some of whom included senior executives at both Wayne Farms and Pilgrim's who used to work at Agri Stats – to decipher production, feed, sales, and other competitively-sensitive metrics for their competitors' facilities.

83.    In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allows for Defendants and their co-conspirators' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report.  The coding system has never changed (*e.g.*, the Tyson complex in Cummings, Georgia has

always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data indefinitely.

84.     Agri Stats plays a significant role in Defendants' signaling practices, coordination, and policing efforts.  The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allows any given Defendant to "reverse-engineer" and interpret the public statements and other publicly-available information about its competitors to determine which complexes are cutting back, and by how much.  For example, if in January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of that Defendant's fellow producers will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement.  Further, Defendants Tyson, Pilgrim, and co-conspirator Sanderson are public companies that report some aggregated data publicly, which executives from other companies use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.

85.     Each Defendant receives numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.  Defendants' complex managers typically receive the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' top executives receive Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant time period, was called the "Executive Report") geared to top level executives.  The Bottom Line Reports contain one row

for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (i.e., overhead), interest expense, and other key operational information related to sales, revenues and costs.

86.     Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permits Defendants to identify their competitors' information contained within each category of report.  For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, includes line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."

87.     Information helping Defendants to assess the size and age of breeder flocks is available in the "Growth Rate Report" section of Agri Stats, which includes complex-by-complex numbers showing the average age, in weeks (e.g., "63.22" or "51.76") of the hens whose eggs, when hatched, become the chickens later killed for meat consumption and supplied to Plaintiff and other chicken buyers.  The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiff and other chicken buyers.

88.     The bird-age data from the "Growth Rate Report" shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter

further down the supply chain. In addition, because the "Growth Rate Report" is available each month, knowing the average age of a given flock from month to month can help determine when flocks are being slaughtered and removed from the supply chain (e.g., if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).

89.     The "Actual Live Production Cost" section of an Agri Stats report also includes (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports include similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense." Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appear by name at the very beginning of the Agri Stats reports – any Defendant can, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.

(i)  Agri Stats' Critical Role in the Chicken Industry

90.     Agri Stats' role in the chicken industry extends beyond the collection and dissemination of competitively-sensitive data. It is an active and knowing participant in, and facilitator of, Defendants' scheme. Agri Stats' employees confirm for Defendants the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives present on a regular basis.

91.     Agri Stats offers a service to Defendants whereby each quarter, personnel from Agri Stats meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings take place at both the production-plant level, where Agri Stats personnel meet with Defendants' complex managers, and at the executive level, where

Agri Stats personnel meet with the leadership of Defendants' hatchery, breeder and feed departments.

92.     Since Agri Stats travels and presents among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats is in a position to share information among Defendants at these regular meetings.  And that is exactly what happened.  For example, during the conspiracy, mid-level Tyson personnel working at complexes in the Mid-Atlantic region were advised by their complex managers about competitors' non-public production information following quarterly meetings between the Tyson complex managers and Agri Stats account managers.

93.     At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided.  Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.  Agri Stats also told Defendants' executives how much the industry was over – or under – supplying the market and estimated demand, and shared other information based on data Defendants provided.

94.     Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats.  Agri Stats maintained at least six "books" for each Defendant:   (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year- to-date sales; (3) the light-green "Production" book, with information on the

Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues and costs.

95.　　Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants.　Indeed, Agri Stats has shipped copies of one Defendant's "books" to other Defendants on a number of occasions.　Despite the impropriety and illegality of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable nor were the "books" returned to Agri Stats.

96.　　In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and account managers Paul Austin, Paul Bunting and Dana Weatherford, regularly host, or present at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.　For example, Agri Stats holds events known as "poultry outlook conferences."　At one such conference on April 23, 2015 in Atlanta, Donohue made a presentation that included the "broiler market situation and outlook" as an agenda item.

97.　　Donohue also helps forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory.　At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, he noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012.　I hope this carries over into the latter half of 2012 based on some of the production

forecasts that can be made based on breeder placements and inventories." Donohue also noted a concern that "if the industry chose to do so, it could ramp up production within a 10- week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again."

(ii)   <u>Defendants' Public Statements Show the Relevance of Agri Stats' Data to their Collective Efforts to Cut Production</u>

98.   Defendants rarely mention their exchange of information with one another through Agri Stats. However, on certain public occasions, such as earnings or investor conference calls, executives from Defendant Tyson (a publicly-traded Defendant) and Sanderson Farms (also publicly-traded) noted the important role Agri Stats data plays in the industry.

99.   For example, Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "look[s] at Agri Stats and see[s] what people are doing and not doing," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated: Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now …. And then once you get past July 4 … I think then you will start seeing reduced egg sets … Typically in my experience the first cut is not enough.

100.   Tyson similarly noted in a December 2014 investor presentation that:

> [t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we

31

will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. *We can tell that through Agri Stats*. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (Emphasis added.)

101. Defendants' use of Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs at the level of detail at which they do constitutes an unreasonable and anticompetitive restraint of trade. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces competition.

102. The Federal Trade Commission's ("FTC") and DOJ's 2000 Guidelines For Collaborations Among Competitors ("FTC/DOJ Guidelines"), and presentations by FTC attorneys, suggest that Agri Stats is far outside the scope of permissible information sharing among competitors. For example:

- The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.

- The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. Upon information and belief, the weekly and monthly Agri Stats reports include dozens of categories of detailed information that in a competitive industry would be considered trade secrets. Therefore, the competitive sensitivity of Agri Stats' reports suggests a particularly high level of antitrust concern.

- The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations. However, Agri Stats reports are issued weekly and/or monthly, and its EMI reports are issued daily, so as to provide nearly current production, sales, and other data to Defendants. Moreover, the nature of Broiler breeder flocks is that they predict future Broiler supply, so by sharing such information in a way that permits company-by-company identification, Defendants are in fact sharing future anticipated production information with one another, which clearly suggests high antitrust concern under the FTC/DOJ Guidelines.

- The FTC/DOJ Guidelines also provide a "safety zone" (i.e., presumptively permissible) for collaborations among competitors that account for no more than 20 percent of each relevant market in which competition may be affected, but Defendants account for approximately 90-95% of Broiler production.

103. One chicken industry expert testified in a case against Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

104. When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

105. A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors ... are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company ... started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY

33

COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

106. A 2017 BLOOMBERG NEWS article titled "*Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service,*" highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their conspiratorial activity:

Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

107. Agri Stats has profited by its participation in this conspiracy through its receipt of payments from producer Defendants of a share of the revenues earned from supra-competitive prices charged for chicken as a result of the conspiracy.

**D.    Defendants' Conspiracy Artificially Increased and Maintained Chicken Prices**

(i)    The State of the U.S. Chicken Market Prior to the Conspiracy – 2007

108. In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was floundering. In 2007, an excess of chicken – the result of significant overproduction by Sanderson Farms, Mountaire Farms and Raeford – began to flood the market, and prices

cratered. By the time the Great Recession fully hit the American economy in 2008, the oversupply and low prices of chickens put Defendants – individually and collectively, as an industry – in dire straits.

109. In 2007, the two largest chicken producers, Pilgrim's and Tyson, reduced their production, and a few other producers – Foster, Peco Farms and Perdue – followed their lead. But cuts by only five industry participants were not enough to affect industry supply to the point that prices would meaningfully increase. In addition, production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production, such as slaughtering chickens early, but not on significant cuts at the top of the supply chain, particularly culling of breeder flocks, which have longer-term effects on supply.

110. The failure of the 2007 shorter-term production cuts to raise prices made Tyson and Pilgrim's realize that their unilateral supply cuts would not raise industry prices without a broader industry supply cut by most of their competitors, and further, that cuts that did not reduce Broiler breeder flocks left the industry vulnerable to near-term increases in supply. Tyson and Pilgrim's realized that by making cuts that were not followed by their smaller competitors, they were essentially giving away market share to those competitors.

111. In 2008, during an early stage of the Great Recession, Defendants and their co-conspirators faced what promised to be a historically bad year for the chicken industry. So they made a joint decision not to return to the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years.

112. Rather, in early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, and at the myriad trade association

meetings attended by many of their senior-most executives, Defendants began calling on one another to heed the mistakes of the past, preaching that oversupply was decimating industry profits, and increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.

113. This production "discipline" – i.e., the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective – was a mechanism to increase Defendants' profits. Defendants and their co-conspirators' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct. In fact, as alleged in this pleading, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole. Defendants – who together with their co-conspirators, collectively control nearly 90% of the U.S. chicken market – jointly engaged in this production reduction effort.

(ii) Defendants Depart from Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts Beginning in 2008

114. Beginning in early 2008, Defendants had implemented their conspiracy by making significant production cuts, including unprecedented cuts in their breeder flocks. The vertically integrated Defendants have the ability to manipulate supply to the chicken market at one or more stages of the supply chain. At the top of the supply chain, Defendants can most effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age. Reducing breeder flocks has the most significant, and long- lasting, effect on supply of chickens in the market.

115.    Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time – anywhere from six to eighteen months, or more – to re-populate a breeder flock that has been reduced through early culling. While Defendants continued to use their traditional methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly-hatched chicks, or slowing processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions.

116.    Defendants and their co-conspirators' collective output-restriction scheme caused a significant slowing in overall chicken production during the conspiracy, bucking the historic trend of steady annual production increases.  The overall effect is shown in the graph below, drawn from USDA data, showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" refrain is more than anecdotal), but then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the conspiracy period:



117.   Broiler prices were significantly elevated during the relevant period due to Defendants and their co-conspirators' conduct.  This is contrary to pricing patterns prior to the relevant period, and contrary to what would be expected in a competitive market.  For instance, during much of the Great Recession, Broiler prices steadily rose despite flat or declining input costs.  Similarly, Broiler prices during the 2015 through 2016 time period remained artificially inflated and failed to account for the historic drop in corn and soybean prices, which constitute 50 – 70% of Broiler input costs.



118.   A 2013 industry analyst forecast predicted that Broiler prices would drop 7.1% in 2014 due to a 50% fall in corn prices.  But instead, Broiler prices increased 9.2%.

119.   Since January 1, 2008, by one measure Broiler prices have been at or near all-time highs roughly half of the time, despite the effects of the Great Recession.

    (a)    *Defendant and their co-conspirators' Executives Publicly Decry the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action Was Necessary*

120.    On January 23-25, 2008, Defendants attended the International Poultry Expo conference in Atlanta where, according to the trade association organizing the annual multi-day event, attendees representing over 99.4% of the production of the major chicken companies participated.  Numerous employees from Defendants attended the conference, including some of Defendants' senior executives.

121.    On a January 28, 2008, earnings call, Tyson CEO Dick Bond – who in the same call disclosed that the company had re-joined Agri Stats and had "just recently ...  got our first series of data" – stated that "we have no choice [but] to raise prices substantially."  However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand, so Bond's comment does not make sense absent an intention (or knowledge) on his part that Defendants would coordinate an industry-wide reduction in supply.  After learning in 2007 that production cuts that it made alone could not force up industry prices, Tyson also sent a clear message to its co-conspirators:  we are not making production cuts until you do.

122.    The day after Tyson's statements confirming its use of Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.  On a January 29, 2008, earnings call, Pilgrim's CFO Rick Cogdill said the industry's oversupply of chickens was hurting market prices.  Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

123.    Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.  Cogdill noted that "[W]e have

walked away from sales in certain cases, where the pricing just did not make any sense.  So we are trying to hold the line.  We are losing at times the competitive bids … So we are trying to take a leadership position from a pricing perspective."  He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply:

- "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs.  We were the leader in cutting production last year to help drive that … [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price;"

- When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen ….  And if the industry doesn't react soon enough it will have to react stronger in the end;" and

- Cogdill responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there….  It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that….  I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that.  I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

124.    On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would cut production.  Asked about production cuts by an analyst, Mr. Sanderson said he thought a production cut was "probable" and "if it's bad and ugly and deep in February, March and April, you'll see the production cuts take place during that period of time.  There's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."

(b)    *Defendants Begin to Cut Production in Concert*

125.   Around March 4, 2008, senior executives from Defendants and their co-conspirators, including Pilgrim's newly-installed CEO, Clint Rivers, Tyson Senior VP Donnie Smith, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.

126.   Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, and proceeded with production cuts.  On March 12, 2008, Pilgrim's newly-installed CEO Clint Rivers, publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions … are absolutely necessary to help bring supply and demand into better balance….  That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply."

127.   Under competitive conditions, other chicken producers would typically respond to Pilgrim's substantial supply cuts by increasing their production.  Yet just the opposite occurred. Following Pilgrim's announcement, a series of production cuts were publicly announced by Defendants' co-conspirators between April 3 and April 11, 2008:

> April 3, 2008:  Fieldale Farms announced a 5% production cut stating that "We're hoping this cut puts supply and demand back into better balance." Fieldale Farms is not a publicly-traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

> April 9, 2008:  Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices.  Simmons is not a publicly-traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.

April 10, 2008:  Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."

April 3-11, 2008:  Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production. None of these companies are publicly-traded, and there was no reason – other than signaling to their fellow producers that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.

128.     Several other chicken producers cut their production between April 1, 2008 and May 15, 2008, but did not publicly announce them.  But because of Agri Stats, there was no need to make a public announcement.  For instance, at his BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond – that "we have seen for the last 6 or 7 weeks … some companies in our industry announce cutbacks.  There have been I think six companies have announced cutbacks.  *I know some companies have cut back and have not announced*."  (Emphasis added.) Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitator, or both.

129.     After seeing many of its competitors abide by capacity reductions between April 3-11, on April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.  Then, on April 14, 2008, it announced a further production cut of 5% of egg sets.

130.     On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed … I don't think the industry will be up [in production] that much anymore,

we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."

131. Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's CEO, Clint Rivers, encouraged further action by other chicken producers at a May 15, 2008, speech at the BMO Capital Markets conference at the Millennium Broadway Hotel – the same conference, also attended by Tyson CEO Richard Bond, where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors. According to an industry publication, Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."

132. A June 2008 Agri-Stats report noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June." The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."

133. A May 21, 2008, WALL STREET JOURNAL article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic:

43

Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year." The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August, and is still the peak of the high-demand summer grilling season.

134.    During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn.  Sanderson responded:  "[w]e don't know yet.  We will make a cut as we always do after Labor Day.  We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January [and] we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King.  That is a period of slow demand for us, and we don't announce that, but we always do it.  It is just a period when we take downdays and we will do that.  But if we think more is needed, we will evaluate that sometime in August, and if need be will do it.  We cut back in 2006, we cut back in '97-98.  I don't know if we announced it or not, but we will do what we need to do."  Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past.

135.    In early June 2008, Pilgrim's CEO Clint Rivers noted in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply … we need to see some balance in the supply….  Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

136.    Other Defendant and co-conspirator CEOs soon picked up on Rivers' call for further action.  On June 19, 2008, chicken industry executives participated in a media conference

call intended to lobby the federal government to limit the ethanol mandate – a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year "and that "we are hearing talk that this was not nearly enough, so liquidation is in round two." This statement referred to the need for Defendants and their co-conspirators to reduce chicken breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight.

137. On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.

138. On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people. In a statement, Foster Farms CEO, Don Jackson, noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."

139.    On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."

140.    On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives.    The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

141.    On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana.    Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."    The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.    Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

142.    In August 2008, Raeford announced publicly, as reported by newspaper the CHARLOTTE OBSERVER, that it would begin reducing its chicken production by 5 percent.    The company said in a statement to industry publication Watt Poultry that "[t]he current obstacles that face our industry require that supply be brought in line with demand."    A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.

46

143.    On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand."  When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July ...  [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November.  We'll see when we get there.  Those are barely impressive cuts.  My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative.  We'll have to see if it works….I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

144.    By September 2008, chicken industry publication WATT POULTRYUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"

145.    On October 3, 2008, Defendants and their co-conspirators' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO, Blair Snyder – elected the day before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included the CEOs of Pilgrim's, Tyson, Perdue and Sanderson Farms.  Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

146.    On October 10, 2008, in response to a USDA report of falling egg sets in the chicken-industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

147.    Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."

148.    During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.

149.    On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly-traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.  Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.

150.    By December 23, 2008, it was reported that Tyson had cut its production by 5%. Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."

151.    On January 28-30, 2009, Defendants and their co-conspirators' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.

152.    In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago.  We're seeing an impact from that on market prices … the industry fundamentals are improving."

153. In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.

154. According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT POULTRYUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce its production during the 2008-2015 time period in line with other producers.

155. By February 25, 2009, Sanderson Farms told THE MORNING NEWS OF NORTHWEST ARKANSAS that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."

156. Similarly, the CEO of Simmons Foods (a private company), Todd Simmons, noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

157. Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009. In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado,

Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.

158. Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, and Raeford. Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.

(c) <em>Defendants' Chicken Production Cuts, from 2008 to Early 2009, Included Unprecedented Reductions to Chicken Breeder Flocks</em>

159. As noted above, in 2008, Defendants and their co-conspirators ended a decades-long trend of annual additional chicken production, surprising industry observers. What makes the production cuts in 2008 and early 2009 remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future. While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants and their co-conspirators took their reductions to the next level by substantially reducing their breeder flocks, as shown in the highlighted section of the graph below:



160.    The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear – during the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009.  For instance, by May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."

161.    Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year.  Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

162.    During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.  For instance, at the National Chicken Council's October

2009 Annual Conference, one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.

163.    However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades – although, because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.  The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.  It was time for Defendants to revamp their conspiracy to make it more effective.  Defendants had learned the value of coordinated supply reductions in 2008; they were quick to react with a new round of publicly-announced production cuts in the first half of 2011, which quickly helped prices recover.

(d)    *Defendants' Conspiracy, Hatched in the Great Recession Continued into 2011 With Another Round of Collective Production Cuts*

164.    Around early 2011, Tyson, in addition to limiting its own production, embarked on a strategy to soak up excess supply produced by its competitors.  Tyson called the strategy "Buy vs. Grow."  Tyson's Buy vs. Grow strategy allowed Tyson to buy up excess production from its competitors and avoid the depression of prices that would occur had the excess production been sold on the open market.  In return, Tyson could communicate the volumes of Broilers it would be willing to purchase from competitors in the current and future months, thus suggesting to each competitor the amount of production it should cut that would not be purchased by Tyson.  As one investment analyst described it, Tyson's program "involves maintaining or even reducing [Tyson's] own chicken production levels, with buying more chicken on the open market from their rival chicken producers, in an effort to keep the chicken

market from being over supplied." Even though it would have been cheaper (with respect to the cost of pounds purchased) for Tyson to grow its own Broilers instead of buying them from a competitor, Tyson engaged in its Buy vs. Grow program because it allowed Tyson to better control supply and production in the Broiler industry and reap the benefit of higher market prices on all of the rest of its Broiler pounds sold.

165. On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen'…. The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation…. The market is calling for around a 5% reduction in chicken production."

166. On a February 4, 2011, Tyson earnings call, COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's Broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.

167. On a February 16, 2011, Cagle's (acquired by Koch) earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."

168.   On or around February 25, 2011, Sanderson Farms CEO, Joe Sanderson, announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina Broiler complex.

169.   On March 7, 2011, Raeford announced a 10% reduction in egg sets that began in early February.  CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions….  Hopefully the chicken prices will begin to increase later this year.  In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."

170.   On March 15, 2011, Simmons announced it was laying off 180 workers at its Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."

171.   On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia.  Defendants and their co-conspirators' senior executives attended the meeting.   Among other positions that Defendants and their co-conspirators' employees were elected to at the meeting, Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.

172.   On April 15, 2011, Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining that "the only way to higher prices is less supply.  The only way to less supply is chicken companies will shut down or cut back….  I think that's what we're going to see."  (Emphasis added.)

173.    Downes' view of the state of the chicken industry was echoed, and amplified, by Joe Sanderson, CEO of Sanderson Farms, who stated on a May 24, 2011 earnings call that "the deal is that the industry – forget Sanderson – the industry cannot sustain losses like they are sustaining for a long period of time.  They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop.  The only way to stop losses with $7 corn is to reduce production and get prices up.  That is the rule and the law of the jungle."  Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (Emphasis added.)

174.    Sanderson's comments came roughly one week after he and Lampkin Butts, Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith).  The conference included a presentation by Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," i.e., breeder flocks, to better balance supply and customer demand.

175.    During 2011, Fieldale Farms reduced its production by an unspecified amount.

176.    During 2011, Mar-Jac reduced its production 10% and reported that other Broiler producers were doing so as well.

177.    On May 17-18, 2011, senior executives from Sanderson Farms, Pilgrim's, and Tyson attended the BMO Farm to Market Conference.  Attending were Sanderson Farms CEO & Chairman Joe Sanderson, Sanderson President & COO Lampkin Butts, Pilgrim's President &

CEO Bill Lovette, Tyson CEO Donnie Smith, and Tyson Senior Group VP of Fresh Meats Noel White.

178.    Pilgrim's President & CEO Bill Lovette presented at the May 17, 2011, BMO Farm to Market Conference.  Lovette's presentation noted Pilgrim's shift away from fixed-rate contracts to market-based pricing.  Pilgrim's also noted its new focus on matching production to forecasted demand, including by adjusting head and bird weights at selected plants to better balance supply and customer demand.

179.    On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Koch Foods in 2012 following Cagle's bankruptcy – said that *"the industry must lower supply in order to offset reduced demand and to support higher market prices.  Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."*  (Emphasis added.)

180.    On approximately June 20, 2011, Defendant Tyson began pulling eggs from its incubators to reduce Broiler volumes.

181.    On June 21, 2011, Cagle's announced it was laying off 300 employees at its Pine Mountain Valley, Georgia plant to reduce Broiler volumes.

182.    In June and July 2011, Defendants and their co-conspirators' senior executives attended industry events, including a seminar held by the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith) and Perdue (Jim Perdue), and co-conspirators Peco Foods (Mark Hickman) and Sanderson Farms' President and COO (Lampkin Butts).  On June 27-29, 2011, the US Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida.  Among other

presentations, Pilgrim's President & CEO Bill Lovette presented to a group of 150 attendees that included senior executives from Defendants.

183.    On June 27, 2011, Simmons announced it was laying off 223 employees by August at its Siloam Springs, Arkansas plant to "shift production to better address soaring corn prices."  In its press release, Simmons blamed U.S. ethanol policies for reducing its production.

184.    On July 12, 2011, Tyson CEO Donnie Smith, Tyson executive Bernard Leonard (Chairman of the National Chicken Council at the time), Sanderson Farms COO Lampkin Butts, Peco Foods CEO Mark Hickman, and Perdue CEO Jim Perdue participated in a panel together at the 2011 Food Media Seminar.

185.    On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees.  Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken….  A key component of that effort is improving our capacity utilization through production consolidation and other operational changes.  By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."

186.    On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved.  Sanderson also stated that it *"wouldn't surprise me if the industry makes further, deeper reductions* in egg sets in October or November....  Nobody knows what cuts might be needed until we get to

October, but *I think that the cutbacks may need to be more than the 6% in head that the industry has in place."* (Emphasis added.)

187.    A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before *industry economics can improve*. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter…. Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (Emphasis added.)

188.    On August 18, 2011, Cagle's announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.

189.    In early October 2011, Defendants and their co-conspirators' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry. The panel included a senior executive from Defendant Perdue (Clint Rivers, by then Perdue's President of Foodservice and Supply Chain, after having been Pilgrim's CEO), and a senior executive from Koch Foods (Mark Kaminsky, COO and CFO). Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. Discipline on the supply side was one suggestion. Getting better prices from retailers was another."

190.    On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.

191.   On a November 21, 2011, earnings call, Sanderson Farms CEO, Joe Sanderson, responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be.  Obviously, we're going to be a part of that."

192.   Throughout 2012, Defendants and their co-conspirators continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.   In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.   On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.

193.   In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.

194.   At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder flocks at 59 to 60 weeks, instead of the typical 65 weeks.  The kind of early slaughter of breeder flocks – including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.

195.    The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank entitled "The U.S. Chicken Industry:  Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:

> U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices.  The poultry industry today operates much differently than it did just a few years ago.

196.    The CoBank report highlighted one of the reasons for this sea-change:  the Defendants and their co-conspirators' reduction of breeder flocks that began in mid-2011, noting that "the recent cuts in the hatchery flock will prevent a quick response," with "U.S. chicken production [...] on track to fall to its lowest level in 5 years by mid-2012."   The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock

reductions, going even deeper than the then-unprecedented 2008-2009 cuts:



197. The sentiment of CoBank's March 2012 report was mirrored by Defendant Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that *the industry is going to remain constrained*." (Emphasis added.)

198. Trade association meetings and industry events in the middle of 2012 gave Defendants and their co-conspirators additional opportunities to meet and discuss the effect of their collusive efforts to reduce production. Examples of these opportunities to conspire included the National Chicken Council Board of Directors meeting in Washington D.C. on March 20-21, 2012; Urner Barry's annual marketing seminar, from April 29 - May 1, 2012; the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012; and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont. Each of these meetings were attended by a number of Defendants' senior executives.

199.   In a July 9, 2012, article, Tyson CEO Donnie Smith was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

200.   On an August 6, 2012, earnings call, Tyson CEO, Donnie Smith, stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts.  The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even more of these types of contracts.  I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

201.   On August 23, 2012, Koch Foods CEO, Joseph Grendys, gave an interview with BLOOMBERG NEWS.  He stated that "[c]osts have gone up so much due to the drought that the industry will be forced to get price increases of 10 to 15 percent across all product lines" for 2013 over this year.  He went on to note that "'[t]he industry needs to be smart' and focus on pricing to ensure it remains profitable….  Even if it does become unprofitable in the fourth quarter, the industry may resume making money after the first quarter of 2013."  The article also mentioned Koch was going to use quarterly adjustments for price in its contracts for the first time since 2008.

202.   On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.

203.   By September 2012, Defendants and their co-conspirators' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for Plaintiff. Cutting those flocks meant that Defendants could not increase Broiler supplies in the short or

medium term, even if they wanted to. The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.

204. On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C. Among those attending the meeting were the President of Defendant Fieldale Farms (Thomas Hensley) and the CEO of O.K. Foods (Paul Fox). Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and *how will the industry apply those lessons in 2012 and 2013*." (Emphasis added.)

205. These actions, taken collectively and not in isolation, demonstrate a level of coordination and "discipline" not seen in this industry prior to the relevant period.

> (e) *Drastically-Reduced Breeder Flocks Boost Chicken Prices and Raise Defendants' Profits to Record Levels*

206. Defendants and their co-conspirators' cuts to the Broiler breeder flocks in 2011-2012 sent flock levels down to levels not seen for almost two decades, as shown in the following graph:



207. For most of the remainder of 2012 through 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels. During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline." For example, on a May 3, 2013 investor call, Defendant Pilgrim's CEO, Bill Lovette, said that:

> Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained…. So I think *the industry is doing an admirable job in being disciplined* on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying…. I believe *the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken* and not necessarily what corn or soybean meal costs. I think I'm confident to say, *we've figured that out and we're doing a good job* of balancing supply and demand. (Emphasis added.)

208. On the May 3, 2013 investor call, Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:

I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk.… I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and we've done a good job so far of maintaining discipline such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry.

209. On October 4, 2013, Defendants and their co-conspirators' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C. A panel, which included the CEO of Defendant Tyson (Donnie Smith), was "chipper about the prospects for their industry in the next few years."

210. Defendants had reason to be positive. For example, on a January 31, 2014, earnings call, Tyson CEO, Donnie Smith, reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand…." Tyson's continued use of Buy vs. Grow, including through the present, allows Tyson and other Defendants to reduce production on a month-to-month basis and have opportunities to learn more information about one another's production and pricing.

211. On a February 21, 2014 earnings call, Defendant Pilgrim's CEO, Bill Lovette, reflected on what had led to the company's record earnings. Lovette noted that "I think the one thing that creates … has created the stability *is the discipline of the industry to not allow profitability in the past to drive supplies* in the future…. And I think that discipline really … is the one ingredient that has made for more stable earnings that we have seen." (Emphasis added.)

212. At a March 12, 2014 industry conference, Defendant Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented

2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.

213.     Industry analysts noted the change in the nature of Defendants' production cuts. On May 6, 2014, a Stephens, Inc.  analyst said in an interview that historically "it has been very easy to increase the chicken supply because the cycle is so short.  It only takes four to eight weeks to grow a chicken, but U.S. chicken producers are having a hard time increasing the chicken supply by much.  They cut production capacity throughout the supply chain when grain prices were very high.  Because of this, they cannot materially increase supply for 2014.  We likely won't see a material increase in production until the second-half of 2015."

214.     During 2013 and into 2014, Defendants continued to find ways to actively depress the size of Broiler hatchery flocks, such as using the pretext of avian flu in Mexico to justify exporting hatchery flock Broilers to Mexico to repopulate flocks rather than use such Broilers to increase domestic production levels.  Indeed, Defendants continued their program of exporting Broiler hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3% of its eggs to Mexico to "fill incubators."  Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline.  We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs.  I think in May we exported 81 million hatching eggs or so outside of the country.  The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made.  And so again that gives us confidence that we're going to continue to be disciplined as an industry."

215.     Defendants' coordinated exportation of Broiler hatching eggs from the U.S. from 2013 through the present is an active effort to artificially reduce the supply of Broilers in the

U.S. below what it would be absent Defendants' active and continued participation in an unlawful antitrust conspiracy. Upon information and belief, Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 to artificially reduce the supply of Broilers in the U.S. and increase the price of Broilers in the U.S. The value Tyson and others received for exporting hatchery eggs to Mexico would have been far exceeded by the price Tyson would have received for hatching those same eggs in the U.S. and selling the resulting Broiler meat in the U.S. market. Therefore, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and to forego higher hatching egg prices in the United States. But Defendants' new-found discipline ameliorated any remaining risk and resulted in higher U.S. broiler prices.

216.    An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014. According to the report:

> [P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.

217.    The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."

218.    On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed in THE NATIONAL PROVISIONER.  The title of Brown's article, "*Biofuel policy holds back production rampup*," continued to blame the Broiler industry's boogey man of the Renewable Fuel Standard (aka the ethanol mandate) instead of Broiler producers' collusive agreement to not increase production in line with demand.  Brown wrote, "current favorable market conditions would normally stimulate production to be somewhat higher, that is, a percentage more aligned with the long-run annual average of 4 percent.  So why are chicken producers not stepping up production to better match the long-term average of 4 percent?  We would if we could, but we can't.  We would like to produce more pounds of chicken, but unfortunately we are not there yet.  The primary reason for the industry's inability to increase production can be attributed to problems caused by a failed policy" of the Renewable Energy Standard.  Brown also went on to blame fertility issues in the breeder stock and a propane shortage that made it difficult to heat chicken houses as other reasons the industry could not increase production.

219.    On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant.  Spent hens are Broiler breeders that have reached the end of their productive life cycle.  The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants and co-conspirators' Broiler breeder supplies.  The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced Broiler breeder capacity resulting from Defendants' initiatives to cut Broiler breeder capacity across the industry.

220.    During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008:  "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting

facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

221. The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy. WATT POULTRYUSA's March 2016 issue noted, for example, that Tyson had achieved "record earnings and sales in fiscal year 2015 ... posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.

222. In late 2015, Broiler industry analyst Heather Jones noted that chicken supplies had not increased as expected from the avian flu due to the fact Defendants had started breaking eggs rather than setting eggs. Defendants coordinated the breaking of eggs with one another during 2015, in part, by the exchange of production information through Agri Stats.

223. This trend continued into 2016. With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs. Defendants maintained

artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction.

224.    For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold."  Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date.  If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%.  So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."

225.    Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that *[the] industry is more geared towards profitability rather than just market share* or field growth."  (Emphasis added.) In other words, Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.

226.    Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction dimension of their conspiracy by keeping breeder flocks low. For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:

> *[T]he industry continues to be disciplined in terms of U.S. supply.*  Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick

placements as a positive. We believe that at least part of the reason is because *chicken producers are being disciplined* and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions. (Emphasis added.)

227. Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability. During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know?…. Since back in 2007 … there are three or four plants shuttered.… It does feel different."

228. On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [sic] set in 2007 … egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week." Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."

229. On the July 28, 2016 call, Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the *discipline* that we continue to see exhibited by the entire industry," which "gives us more confidence that we're going to do the right thing with respect to maintaining that

*discipline* … and … gives us confidence that we're going to continue to be *disciplined* as an industry." (Emphasis added.)

230. On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith – who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 – stated that "our chicken business is ... it continues to do great," a comment seconded by Hayes, who said about the company's chicken business that "year-over-year, we're doing great ... all that business is very profitable to us."

(iii)    Collusively Manipulating the Georgia Dock Benchmark Price Index

231. Defendants' successful efforts to artificially boost chicken prices by collectively reducing supply was buttressed in the latter years of their output-restriction scheme, by collusively manipulating the Georgia Dock benchmark price index, a chicken industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including certain plaintiffs.

(a)    *Overview of the Georgia Dock, USDA Composite, Urner Barry, and EMI Chicken Price Indices*

232. Broiler chicken prices are reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture (aka "Georgia Dock,"), and the USDA. Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").

233. Urner Barry collects and publishes daily price information for Broilers, while for the USDA's Composite index, USDA collects and publishes Broiler price information on a weekly basis. USDA's Composite price index is publicly available for free. Urner Barry's chicken price information is subscription-based, so all producers and many purchasers subscribe for a fee. The USDA and Urner Barry's Broiler price indices are based upon a system of double

verification, which includes telephonic and written surveys of all or nearly all chicken producers, but also verification of reported prices from purchasers such as brokers and customers. The Georgia Dock price survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below.

234.    The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc. According to a May 2010 FarmEcon study, EMI's pricing report[3] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from Broiler companies.

235.    Published prices for Broilers from Urner Barry, Georgia Dock, and USDA relate to the spot market for Broilers. However, prices for chicken, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.

236.    Statements by chicken company executives and industry experts confirm that chicken sales, whether by contract or on the spot market, are tied to spot market pricing. For instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry." Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis) testified that "internal Pilgrim's documents show that virtually all chicken products, even

---

[3] Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut, whether the product was chilled with ice or $CO_2$, the price, and numerous other pieces of information.

if they're not sold spot, are tied to the spot prices.... 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to Broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's Broiler sales were tied to Broiler spot market prices such as Georgia Dock.

237. As a consequence of the inelasticity of supply and demand in the Broiler industry (discussed below) and the availability of the spot market price indices (discussed above), public price increase announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase Broiler spot market prices, and therefore that all Broiler prices would increase.

> (b)    *The Georgia Dock Pricing Methodology and Its Susceptibility to Manipulation*

238. The Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken.[4] The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.

239. Buyers, including Plaintiff, relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought – especially since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was meant to reflect the market price of chicken.

---

[4] Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs. At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.

240.    Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Conspirators, who are the ten chicken producers that submitted price quotes to the GDA for inclusion in the index.  The Georgia Dock Conspirators are the ten producers whose price quotes went into the Georgia Dock index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price):  Pilgrim's Pride (33%); Tyson (14%); Fieldale (14%); Perdue (9%); and Sanderson Farms, Koch, Claxton, Mar-Jac, Harrison and Wayne Farms, each with a 5% market share.

241.    The significant difference between the Georgia Dock price index and other Broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high Broiler prices to the GDA, as the one cent Rule requires that outlier prices deviating by more than one cent from the initial dock price be excluded from the final Georgia Dock price.  Instead, the deviation of the Georgia Dock price index from other indices – indices that are themselves based on verified sales by Defendants – can only be attributed to all or nearly all participating Broiler producers collectively submitting artificially high and identical or very nearly identical Broiler prices to the GDA.

242.    To compile the Georgia Dock price index, according to an internal GDA document provided recently to the NEW YORK TIMES through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with."  A single price is given by each Broiler producer company and it is accepted without any verification of actual invoices or any other form of auditing to verify accuracy.  In response to a recent press inquiry,

the GDA explained its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."

243.    Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from Broiler companies, Arty Schronce, was deeply concerned.  In a September 2016 internal GDA memorandum, disclosed publicly for the first time on November 17, 2016, in a WASHINGTON POST article, Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture."  Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided.  However, I have come to question the validity of some of the information provided."

244.    Schronce's Memorandum confirms the significance of the one cent rule.  Schronce's memorandum noted that after a January 2016 article about the Georgia Dock price index in the WALL STREET JOURNAL, one "company appears to basically not take part in the Whole Bird Dock Price process.  They seem to deliberately submit a low bid that they know will be kicked out.  However, they can claim that they are submitting something lower.  In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."

245.    Until late 2016, the Georgia Dock pricing methodology was not publicly available.  Chicken buyers whose transactions with Defendants were based on the Georgia Dock whole-bird price, mistakenly believed it reflected the actual market price of chicken.  Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price

alongside the USDA Composite, many chicken buyers erroneously believed the Georgia Dock price to be a USDA price.

246.    In addition, Defendants falsely represented that the Georgia Dock benchmark price is based on a complicated "algorithm" from the GDA that takes into account various factors, such as bird weights, weather, mortality rates, and demand.  Plaintiff was misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Conspirators' actual sales prices as reported to the GDA.  But neither was true:  there was no complicated "algorithm," nor did the Georgia Dock Conspirators report their true prices to the GDA, agreeing instead to intentionally report false, artificially-high (or artificially-stabilized) prices.  The reality was that the Georgia Dock price was simply whatever the Georgia Dock Conspirators said it was.  Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Conspirators told the GDA that the sales price of their chicken was now $2, the Georgia Dock price was $2 – and the prices that Plaintiff and others paid for chicken increased commensurately

247.    Once a week, Schronce would call the same ten individuals at the Georgia Dock Conspirators to collect price quotes, which were supposed to reflect their actual sales prices.  He weighted each producer's price quote by its above-referenced relative market share (referred to by the GDA as that company's "voice").

248.    The price quoted by each Georgia Dock Conspirators to the GDA was based on 2.5- to-3 pound whole chickens, but only a handful of the Georgia Dock Conspirators actually processed 2.5-to-3 pound birds in Georgia, so, according to internal GDA documents, the Georgia Dock Conspirators were "supposed to adjust their whole bird quote as if they are producing that sized bird."  Once the final Georgia Dock whole bird price was calculated, the

GDA then used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Conspirators provided to the GDA each Wednesday.

249. In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers.

250. Schronce, who began compiling the Georgia Dock Conspirators' price quotes in 2012 following the retirement of his predecessor, first made a preliminary calculation based on the single price quotation from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."

251. Due to the GDA's one cent rule, it was not possible for only one or two Broiler companies to report a significantly higher Broiler price to the Georgia Dock without being disregarded as outliers by the GDA. Accordingly, on information and belief, Plaintiff alleges that Defendants began collectively reporting prices to the GDA that not only were identical or nearly identical, but also were significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilize during 2015-2016 at near historic highs. As described further in this Complaint, it was not until a series of articles was published between

November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants may have fixed the Georgia Dock price.

252.    Nothing was done to verify or substantiate these numbers.  There was no "double-verification;" customers were never contacted to check to see if the producers' prices were legitimate.  The entire process was based on unverified, verbal "price quotes" from the same small set of chicken producers (the Georgia Dock Defendants) submitted each week to a single GDA employee, a methodology that was "susceptible to manipulation."

253.    To facilitate their control of the Georgia Dock benchmark price, the Georgia Dock Conspirators convinced the GDA to convene a non-public, non-governmental "Advisory Board" comprised senior executives from eight of the ten private sector Georgia Dock Conspirators (including three Defendants in this action) to advise the GDA on the Georgia Dock price.  From at least September 2012 through 2016, the Advisory Board included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods), and from Defendants: Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), and Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia).

254.    The existence and conduct of this private sector Advisory Board was not known to chicken buyers until November 2016 when it was first made public following a press report about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology.  He wrote in the memorandum that he had "questions about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent.  I was told I could not make any changes without clearing them with the Advisory

79

Board." The Advisory Board gave the Georgia Dock Conspirators a vehicle to discuss and artificially set price quotes to ensure compliance with their price-fixing agreement.

255. In December 2015, the GDA began an internal review of the Georgia Dock pricing methodology, in large part, because the agency had "serious concerns" about the way the index was compiled. The GDA's internal review was not made public at the time it began, and was not revealed until it was described in a series of press reports beginning in November 2016. Schronce, in his September 2016 memorandum, expressed concerns that some companies have a "larger, even outsized role in determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."

256. On July 19-20, 2016, high level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price. The USDA officials shared their conclusion that GDA could no longer simply accept Broiler prices from Defendants and their Producer Co-Conspirators without verification, and instead would have to verify invoice-level data to confirm reported prices. On July 20-21, 2016, USDA officials requested that the GDA provide the USDA with data from Broiler producers to "test and review" the Georgia Dock price for accuracy.

257. On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.

258.    In 2016, high level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock.  For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions.  These factors alone illicit [sic] anti-trust review."

259.    GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and reported without regulatory oversight.  The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of."  In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.

260.    Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected."  In short, the GDA had been publishing the Georgia Dock price for decades, but until the last few months, apparently did not know the scope of reliance on the Georgia Dock price.  Significantly, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016.  The sanitized August 5 report removed references to the existence of factors in

the Broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."

261.    On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price."  The Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members.  Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand – Defendants already report such invoice information to Agri Stats on a daily basis.  According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report.  We can move forward with sending to USDA."  GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.

262.    Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology in late 2016.  After the Georgia Dock Conspirators balked at the GDA's new methodology – which required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether when it did not receive sufficient price quotes to compile the index.  The last Georgia Dock benchmark price was published by the GDA on November 23, 2016.  However, for several months after the last Georgia Dock price was

published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.

263. On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5-to-3 pound Broilers that replaced the same weight Broiler previously reported by the Georgia Dock price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continues to be subject to manipulation by Defendants and does not reflect actual market prices.

264. On November 3, 2016, the NEW YORK TIMES published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the WASHINGTON POST provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the WASHINGTON POST article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a BLOOMBERG NEWS article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants and their co-conspirators continue their efforts to conceal the conspiracy alleged in this Complaint.

(c)     *Georgia Dock Prices Diverged From the USDA Composite and Urner Barry Price Indices Beginning in 2013*

265.    In early 2013, the behavior of the Georgia Dock index significantly changed.  The changes resulted from the conspiracy by the Georgia Dock Conspirators to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price.

266.    Beginning in early 2013 and continuing until November 2016, the Georgia Dock Conspirators agreed among themselves to submit artificially high and identical, or near-identical, prices to the GDA, which allowed them to continually increase, and successfully stabilize, chicken prices tied to the Georgia Dock benchmark price index.

267.    Historically, the Georgia Dock benchmark price was highly correlated to the prices in the USDA Composite and Urner Barry indices; the movement (i.e., volatility) of the Georgia Dock price mirrored the patterns of the other two indices (e.g., prices go up or down depending on market forces, such as supply and demand).  This changed in 2013, when the price volatility that had marked the Georgia Dock (and which still marks the other two indices) largely disappeared.  Georgia Dock prices mostly stabilized, while prices in the other two indices remained volatile.[5]

268.    Starting in 2013, monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (i.e., when prices dropped, they dropped far less drastically than they had prior to 2013).  This near-disappearance of price volatility was unique to the Georgia Dock.  Both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of

---

[5] Plaintiff alleges that prices reported in the EMI, Urner Barry, and USDA Composite price indices were also supra-competitive and artificially inflated by the output- restriction aspect of Defendants' scheme.

the    various    indices    both    before    and    during    the    relevant    period:



269.    Beginning in 2013, the Georgia Dock benchmark price began to behave in a markedly different manner due to Defendants' price-fixing conspiracy. Starting in early 2013, the Georgia Dock component of Defendants' conspiracy kicked into high gear, as the Georgia Dock price – for the first time ever – became negatively correlated with the other two price indices (i.e., the Georgia Dock price increased while prices in the other two indices decreased). This marks a dramatic change from 2002 to 2012, where all three indices were positively correlated with each other (i.e., they moved up and down together).[6]

270.    After at least a decade of high correlation with the USDA Composite and Urner Barry indices, the Georgia Dock benchmark price diverged dramatically from the other two

---

[6] After 2013, the USDA Composite and Urner Barry indices remained positively correlated with each other.

indices in 2013 and thereafter – Georgia Dock prices were far more stable, and substantially higher, than the USDA Composite and Urner Barry prices. The stability and level of Georgia Dock prices from 2013 through November 2016 was the direct result of Defendants' conspiracy.

**E.** **The Structure and Characteristics of the Chicken Market Make it Highly Susceptible to Collusion**

(i) Highly-Concentrated Market with Vertically-Integrated Producers

271. The Broiler industry is almost entirely vertically integrated, with Broiler-processing firms owning or tightly controlling almost all aspects of production, processing, and marketing. In the Broiler industry, "vertical integration" means the chicken company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of chicken. Many integrated chicken companies also own further processing plants.

272. Because chicken producers have determined over time that the economics of growing chicks into full size Broilers are unfavorable, the chicken industry has developed a system of production-contract farming. The integrated producers provide the feed and chicks to farmers (which remain under ownership of the integrated producer); the contract farmer then has roughly 6-7 weeks to grow the chicks into full size broiler chickens. During this "grow out" period, the integrated producer's employees frequently monitor the broiler chickens. Once fully grown, chickens are picked up by the integrated producer and brought to an integrator-owned processing plant (aka, slaughterhouse). Some of the chickens are sold without any further processing, while other chickens are further processed by integrated companies into value-added specialty products (e.g., chicken nuggets, tenders, etc.).

273. The graphic below indicates the key stages of Broiler production that vertically integrated chicken companies' control, which are all those points in the production process

which provide integrated chicken companies complete control over supply and allow them to capture the greatest profit margin:



274. According to a paper prepared in connection with the USDA and DOJ's failed effort to increase competition in the Broiler industry in 2010, "[c]ontrol over the number of birds delivered to the processing plants allows processors to match more closely inputs to plant capacities and lower per-unit processing costs, as well as to better meet consumer requirements." In connection with the same effort by the USDA and DOJ, a former expert witness for Defendant Tyson, Michael Dicks, wrote, "[i]n the poultry industry vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per

year rather than terminating grower contracts in much the same way the USDA requires all commodity program recipients to adhere to acreage reduction program guidelines and grower associations require members to cut back marketable output."

275.    Modern chicken producers rely on a handful of unique breed lines to mass produce essentially identical chickens with desirable genetic traits.  Genetics companies, which develop strains of grandparent and great-grandparent breeding stock, sell to integrated Broiler producers breeders that have special hybrid characteristics, such as a tendency to produce a large chicken breast.  Genetics companies create a "biological lock" on their unique Broiler lines by tightly controlling the purebred genetic strain that they develop.  After an integrated producer purchases young breeder hens (aka "breeder pullets") from a primary breeder, the integrated producer raises the birds to be breeders that lay eggs to be taken to incubators at an integrator-owned hatchery.  The chicks from Broiler company hatcheries are then sent out to the integrated producer's contract- farmers to raise into adult Broilers.

276.    At present, no chicken production company except Tyson owns the genetics or produces the grandparent or great-grandparent strain for the Broilers it raises and slaughters. Nearly all U.S. producers now rely on 3 global genetics conglomerates:  Cobb-Vantress (owned by Tyson), Hubbard, and Aviagen.  These three companies supply the breeder stock, and therefore ultimately the Broilers, that account for 98% of Broilers raised in the U.S. and 80% of Broilers raised globally.  While there were 26 Broiler genetics companies world-wide in 1981, acquisitions by the three remaining companies have essentially eliminated any other meaningful competitors in the U.S. Tyson's Cobb-Vantress subsidiary has approximately 50% market share.

277.    Since a supply of primary breeders is essential to each chicken producer's business, Tyson's ownership and control of subsidiary Cobb-Vantress provides it with

exceptional leverage over other Defendants to mandate compliance with Defendants' unlawful agreement. Tyson can offer other Defendants the carrot of access to Cobb-Vantress' unique Broiler genetic lines, with desirable qualities like high conversion rates of feed into meat. However, Tyson can also use Cobb-Vantress as a stick against any competitor who Tyson and/or its co-conspirators believe is overproducing chickens by providing such competitors inferior, sick, or an insufficient number of breeder pullets, or withholding breeder pullets altogether that the competitor needs to operate a profitable business.

278.    Perdue was the last Broiler integrator in the U.S. to maintain its own genetics research company besides Tyson, but Perdue sold its genetics company to Tyson in 2014. In announcing the sale, Perdue issued a press release that stated "there are no longer significant advantages to having our own breed … it is important that we have the flexibility to select the breeder combination that works best for each specific customer requirement." The press release went on to note that "[w]ith the outstanding exception of the Cobb-Vantress enterprise owned by Tyson Foods, no producer has managed to effectively compete using an in-company breeding program against a multinational primary breeder. To be cost effective a genetics program based on index selection incorporating the measurement of significant traits and applying sophisticated molecular markers and field testing requires a magnitude of scale exceeding the capacity of individual producers."

(ii)    The Market for Broilers is Characterized by Inelastic Supply and Demand

279.    Inelastic demand means that increases in price result in limited declines in quantity sold in the market. In order for a group of companies to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows group members to raise prices without seeing a decline in sales revenue. Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more

89

inelastic over the past 40 years. In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist, Michael Dicks, presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions, stating that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year … Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."

(iii)    <u>There are no Significant Substitutes for Broiler Chickens</u>

280. Pork and beef are the most likely alternative sources of protein to chicken, but pork and beef are not economic substitutes for chicken. Numerous studies have found that the cross elasticity of demand between chicken, beef, and pork is either negative or statistically insignificant, meaning that pork and beef are complements to chicken, but not substitutes.

281. The historically high spread between the price of pork and beef versus chicken since 2008 has also reduced any possibility of substitution of chicken with pork or beef.

(iv)    <u>The Broiler Industry Has Experienced High Consolidation and is Highly Concentrated</u>

282. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.

283. In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the

90

large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.



284.    As of 2015, Defendants and their co-conspirators controlled 88.8% of Broiler production in the United States.  Since the start of the relevant period, there has been surprising stability in market share for each Defendant and Broiler Company shown in the graph below. The two exceptions are Pilgrim's loss of market share due to its large plant closures during bankruptcy in 2008-2009 and Koch Foods' increase in market share due to the purchase of a plant from Tyson and purchase of bankrupt Cagle's, Inc.



285.    Additionally, Broiler companies increasingly rely on de facto consolidation whereby Defendants acquire nearly complete control over seemingly independent smaller Broiler companies.  Defendants' de facto consolidation creates "zombie" Broiler companies that on paper are separate and independent entities, but are in fact completely controlled by Defendants through co-packing contracts.  For instance, Tyson Foods has co-packing arrangements with a number of smaller Broiler producers in which Tyson purchases either:  (1) the company's entire production of Broilers (including dark meat), or (2) all of the company's white meat (i.e., chicken breast and wings) and encourages the company to export the less valuable dark meat to remove that supply from the United States market.

286.    Upon information and belief, Defendants' co-packing contracts with smaller producers are typically 2-5 years in length.  Even where the co-packing arrangement is only 10-20% of a smaller producer's overall supply, Defendants are in a position to pressure smaller producers to limit their production.  Co-packing contracts give Defendants unprecedented control over supposedly independent producers, including control over the breed of bird grown, what feed can be used, how many birds can be grown, and numerous other aspects of raising Broilers.  With respect to processing, Defendants not only require exacting specifications for co-packing partners, but also put Defendants' own employees in the processing plants of their co-packers and supervise every significant detail of the slaughter and packing process.

287.    Upon information and belief, the purpose and/or effect of Defendants' co-packing arrangements is to avoid scrutiny from antitrust regulators that would come with formal merger arrangements, including possible discovery of Defendants' anticompetitive agreement to reduce the supply of Broilers in the U.S.

        (v)    <u>The Broiler Industry Has a History of Government Investigations and Collusive Actions.</u>

92

288. In April 1973, the DOJ filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members from continuing a conference call program where members (and even some non-members) coordinated the pricing and production of Broilers. In response, numerous private civil antitrust actions were filed against the NBMA and 42 individual defendants in the In re Chicken Antitrust Litigation case. The NBMA and Broiler producers eventually settled the case, resulting in a settlement of roughly $30 million.

289. Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the upstream, contract-farmer Broiler market. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually watered down the rule and led to the resignation of the official charged with imposing tougher regulations.

290. In 2011, George's, Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (*United States v. George's, Inc.*),[7] which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.

---

[7] *United States v. George's Foods, LLC et al.*, No. 5:11-cv-00043 (W.D. Va.).

291.     According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition … [c]oncerns [such as] the exercise of market power by Broiler integrators [which] have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

292.     Numerous cases in recent years have documented the lack of competition in the contract-farmer Broiler market, which while upstream in the supply chain from the direct purchaser market in which Plaintiff purchased chicken from Defendants, suggest an absence of true competition and instead suggest a practice of coordination and collusion among Defendants and their co-conspirators.  In cases such as *Adams v. Pilgrim's Pride*, No. 2:090-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp*., No. 5:06-cv-00004 (E.D. Tex.), contract-farmers have alleged violations of the Packers and Stockyards Act by integrated Broiler producers.

(vi)     Existence of Numerous Trade Associations and Access to Competitors' Data Through Agri Stats

293.     The existence of industry trade associations makes a market more susceptible to collusive behavior because they provide a pretext under which co-conspirators can engage in anticompetitive conduct.  Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting and punishing cheating.  The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy:  National Chicken Council, United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, and Poultry Federation (representing chicken producers in Arkansas, Missouri and Oklahoma).  Indeed, according to COMMUNICATION IN POULTRY GROWER RELATIONS:  A BLUEPRINT TO SUCCESS, a book written

by Larry Cole, a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups, further noting that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that which is good for individual companies is good for the industry."

294.    Defendants are members of several Broiler-related trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Integrated Broiler producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top-level executives at trade association meetings is the norm rather than the exception.

295.    According to its website, "[t]he National Chicken Council represents integrated chicken producer-processors, the companies that produce, process and market chickens. Member companies of NCC account for approximately 95 percent of the chicken sold in the United States."  The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

296.    The NCC has three annual board meetings attended by Defendants' senior executives, including most or all Defendants' CEOs and other top executives.  CEOs generally always attend the following three NCC meetings each year, in addition to special committee meetings or other special NCC events:  (a) the January meeting of the NCC held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting, and (c) the NCC Annual Meeting in October.  Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their

competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives an opportunity to talk casually with their competitors. Following the meeting, Defendants' CEOs and top level executives often meet, socialize and golf, hunt, or fish together.

297. Upon information and belief, CEOs and top level executives from Defendants discuss topics with one another relating to pricing, production, and other non-public, proprietary information outside of NCC's formal meetings at the informal settings surrounding NCC meetings described above. These regular, informal, and in-person opportunities to discuss pricing and production in the Broiler industry gives CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict Broiler production.

298. The United States Poultry & Egg Export Council ("USAPEEC") has its home office in Stone Mountain, Georgia. Defendants are members of USAPEEC. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The group has evolved into an association that is an advocate for the industry on trade policy issues. USAPEEC has about 200 member companies and organizations. USAPEEC holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants and their co-conspirators.

299. The U.S. Poultry & Egg Association ("U.S. Poultry") describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of Broilers, turkeys, ducks, eggs and breeding stock, as well as allied companies.

Defendants are all members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall.

300. The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state. The Federation was founded in 1951, and since that time has represented the interests of the entire poultry industry at the state and federal level on legislative and regulatory matters." The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." The Georgia Poultry Federation has regular meetings each April, August, and September which typically are attended by Defendants' senior executives. Defendants are all members of the Georgia Poultry Federation.

301. The North Carolina Poultry Federation "has been the voice of the North Carolina poultry industry since 1968." The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." The North Carolina Poultry Federation holds regular meetings each year, including annual meetings and Board of Directors meetings which typically are attended by Defendants' senior executives. Defendants Tyson, Perdue, Raeford, and Pilgrim's are each members of the North Carolina Poultry Federation.

302. The Poultry Federation was established in 1954 as a non-profit trade organization to represent the poultry and egg industries in Arkansas, Missouri, and Oklahoma. In 1998, the Arkansas, Missouri, and Oklahoma organizations were consolidated and became The Poultry Federation. The Poultry Federation claims to promote all poultry interests relating to production, distribution, merchandising, and consumption of poultry, and poultry products. It disseminates

information relating to the various phases of the Broiler industry to improve and expand markets, to increase efficiency in production and marketing, and to encourage and support research in production and marketing of poultry. The Poultry Federation holds regular meetings each year, including Board of Directors meetings with Defendants' senior executives identified below. Defendants Pilgrim's and Tyson are both members of the Poultry Federation.

303. The International Poultry Expo ("IPE") was held annually from 2008-2012. The IPE billed itself as "the networking hub of the world for the poultry industry." The IPE was held annually in late January in Atlanta, Georgia. Defendants' senior executives, and numerous mid-level executives and other employees, attended the IPE each year. The International Producers and Processors Expo ("IPPE") is the world's largest annual poultry, meat, and feed industry event. IPPE held its first event in January 2013 and combined three previously separate expos – the IPE, the International Feed Expo, and the International Meat Expo. According to the IPPE's website, a wide range of international decision-makers attend this annual event to network and become informed on the latest technological developments and issues facing the industry. The 2015 IPPE featured more than 7,245 international visitors from over 103 countries, including attendees from Chile, France, Singapore, and Australia. IPPE indicates that Defendants each sent their "Top Management" to the 2014 IPPE in January 2014. The most popular panel each year is the "market intelligence" forum, which features an Agri Stats executive speaking regarding the Broiler industry. Similarly, Defendants' senior executives attended IPPE in 2015 and 2016.

304. The International Poultry Council ("IPC") was formed in 2005 and is composed of national trade associations from 23 countries, as well as 40 individual companies that are "Associate" members. The IPC website bills the organization as the "voice of the global poultry

industry" and its mission is to "strengthen communication between the industries of different countries." The NCC, USAPEEC, and USPOULTRY are members of the IPC on behalf of United States poultry producers, along with individual company members of the IPC, including Tyson, Cobb-Vantress (a Tyson subsidiary), and JBS S.A. (Pilgrim's parent company). Additionally, the Chilean poultry trade association ("APA") and the Australian Chicken Meat Federation ("ACMF") are also members of the IPC.

305. Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).

306. Defendants also permitted each other to tour the others' Broiler plants, which revealed confidential business methods employed by a company. While such tours were often framed as "best practices" information exchanges, they permitted senior executives the opportunity to conspire.

307. Defendants also accessed each other's above-described data through Agri Stats to monitor cheating in the conspiracy. Agri Stats acted as an active facilitator of Defendants' conspiracy.

(vii)    High Barriers to Entry

308.    The existence of high barriers to entry is one factor which makes markets susceptible to collusion.  A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help facilitate the formation and maintenance of a conspiracy.

309.    The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry.  Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market.  The existence of low, and highly variable, profit margins also act as significant barriers to entry.  With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more.  Companies already in the market – such as Defendants – are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels.

310.    Substantial barriers impede entry into the Broiler market.  A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, construction of processing plants, feed mills, hatcheries, equipment, energy, transportation distribution infrastructure (aka, "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic

area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

311. Defendants themselves acknowledge the substantial costs of entering the market and view it as important that new entrants not be able to purchase closed facilities. For example, when the State of Louisiana pressured Pilgrim's to sell its closed Farmerville Broiler complex, Pilgrim's executives expressed concern about any state assistance to the buyer to purchase the Farmerville Broiler complex because such assistance could substantially reduce the buyer's cost basis therein, which could then permit the buyer to flood the market with low-cost Broilers.

312. The price of construction of a new integrated Broiler processing complex (hatchery, feed mill, and processing plant) able to compete on price with current integrated producers is relatively high. Even for a current market participant, such as the third-largest producer (Sanderson Farms), construction of a new Broiler complex (i.e., feed mill, hatchery, and processing plant) in 2010 was estimated to cost $100-$125 million. However, these costs fail to account for other hurdles to new market participants, discussed above.

313. The barriers to entry in the Broiler industry have proved insurmountable for potential new market entrants. No company has created a new poultry company from scratch in decades. Further, when one foreign meat company (a Ukrainian company, Omtron) tried to enter the U.S. market in February 2011 by buying a portion of the assets of bankrupt Broiler producer Townsend's, Omtron invested $35 million to improve the facility's processing operations, but went bankrupt only five months after making the purchase.

314. A number of large foreign meat conglomerates have acquired U.S. Broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), and

Marfig Alimentos S.A. (Keystone Foods). However, each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. Broiler company as a subsidiary. Ownership of U.S. Broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. Broiler production business.

315. A further barrier to new entrants is the unwillingness of large vertically integrated producers to sell an idled Broiler complex, which also keeps open the threat that an integrated producer will restart a closed Broiler complex. Pilgrim's has been explicit about this threat to new market entrants. For instance, in a February 2014 earnings call, Pilgrim's was asked whether it had any plans to sell "a couple of idled U.S. facilities … to use that as a source of capital," to which Pilgrim's CFO Fabio Sandri replied "[n]o. We are thinking those are held defensive, so we don't plan to sell them in this short-term or in the near future." Such a threat of restarting idled facilities, rather than selling those facilities, represents a substantial barrier to entry for new market participants because an existing Broiler producer can merely restart a closed mill to drive down prices and run a new entrant out of business.

      (viii)   Defendants Have Similar Cost Structures and Work Collaboratively to Share Cost Information

316. Another factor antitrust law and economics have identified as making markets susceptible to price-fixing is similar cost structures. The majority of production costs for Broiler producers are variable. All other factors being equal, when variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a group of producers to boost prices artificially with greater success than when fixed costs are the largest component of production costs.

317.    The single largest cost component of producing Broilers is feed, which primarily consists of soybean meal and corn.  Broiler feed prices have varied widely from 2007-2016, reaching 71% of the cost of growing Broilers in 2012, but falling to only about 50% by 2014.

318.    Input costs other than feed include processing plant labor costs (~15%), materials (~11%), and capital equipment (~2.5%).  Labor costs have declined significantly over the past two decades for Defendants, while at the same time labor productivity has substantially increased.

319.    Broiler feed costs have been decreasing sharply since record highs in 2012.  For instance, prices for soybean meal were down 10% in 2014.  Since January 1, 2008, corn prices have declined roughly 21% and soybean prices have declined 13%.  During the same period, Broiler prices increased roughly 50%.

320.    Defendants have relatively similar cost structures.  The technology and process of industrial scale growing and processing Broilers is well known and Defendants employ the same types of equipment and processes in the production process.  Defendants also have only three companies from which they can obtain breeder stock from which to raise Broilers, so there are very limited options with respect to purchasing the most cost efficient Broiler genetic lines. Similarly, Defendants all purchase corn and soybeans on the open market, so they have limited ability to obtain substantially different pricing on these key variable cost inputs for their Broilers.

321.    Defendants use Agri Stats to share extraordinarily detailed cost information, so they are able to constantly realign their cost structures with one another.  Agri Stats permits each Defendant to have extremely unusual knowledge of competitor costs and to make adjustments to standardize each company's cost structure across all Agri Stats participants.

322. Defendants engage in a program of "feedmill cross-testing" in which some Defendants exchange feed and chicks with one another for the purported purpose of determining which Defendants' feed and/or chicks have superior qualities. Defendants claim this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for a producer to provide its proprietary feed mixes and/or chicks to its competitor, thereby giving away any competitive cost advantage over its competitors.

323. Another sign that Defendants do not view production costs as secret is the fact that it is not unusual for Defendants to permit competitor's CEOs access to each other's production complexes. In a competitive industry, production methods typically are closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage over its competitors. However, this is not the case in the Broiler industry. For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue's operations and panel discussions with Defendants' senior executives.

**F.    Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy**

324. Defendants collectively adopted several strategies to buttress and sustain their conspiracy.

(i)  A Collective Shift Away from Long-Term Fixed-Price Contracts

325. Beginning in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-

104

available price indices (including the USDA composite, Urner-Barry, and the Georgia Dock). A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helps facilitate an antitrust conspiracy. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 659 (7th Cir. 2002). Defendants' shift indicates that they anticipated higher prices resulting from their production cuts, and wanted the flexibility to take advantage of such increased prices.

326.　Starting around January 2008, senior executives from Pilgrim's, Perdue, and Tyson (as well as Sanderson Farms and Koch Foods), publicly announced an effort to reduce annual fixed-price contracts. This change coincided with Defendants' efforts to reduce chicken industry supplies so as to drive chicken market prices higher.

327.　On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

328.　On January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [i.e., having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.

329.    On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

330.    Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

331.    Industry observers noted the trend of Broiler producers moving away from fixed price contracts.  For instance, a December 2013 report by Stephens, Inc.  analyst Farha Aslam noted that "[w]ith volume growth generally limited, companies are developing more sophisticated strategies to generate profits....  'Rather than annual fixed price contract[s] that are negotiated every fall, companies are partnering with customers and creating contracts that can be multi-year in duration.  Contracts are now being negotiated all year long and employ a wide variety of pricing methodologies.'" This confirms that even contracts which are long-term in duration are not "fixed" so as to prevent price increases when coordinated supply reductions drive up Broiler market price indices.

(ii)    Inter-Defendant Sales

332.    Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs.  In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors.  Such purchases also permitted companies to maintain market share despite reducing their production.   In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.

106

333.    In 2011, for example, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow."  Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced product to a customer than a competitor.  Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand.  We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."  Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow producers would maintain their production levels as they were and not increase them.

334.    In a November 5, 2012, interview, co-conspirator Fieldale Farms' President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens.  Now we know where all our chickens are going.  So we are buying chickens in that lower price area instead of selling them.  So, no expansion for us."

335.    By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week.  Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.

336.    During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 %, expanding its purchases from competitors to unprecedented levels.  Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of

2015 and 2016. Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers. Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.

        (iii)    <u>Atypical Increases in Defendants' Exporting of Chickens</u>

337.    During 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels. Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."

338.    Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

339.    Defendants' coordinated exportation of chicken hatching eggs, from 2013 through 2016, was an active effort to artificially reduce the supply of chickens in the U.S. below what it would have been absent their active and continued participation in an illegal antitrust conspiracy.

340.    Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and increase the price,

of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market. Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new- found "discipline" ameliorated any remaining risk and resulted in higher overall U.S. chicken prices.

341.    Some of the Defendants, including, Pilgrim's, and Tyson, participated in Overseas Distribution Solutions ("ODS"), an organization of exporters founded in 1999 that operated through 2011. As alleged above, those exports were part of Defendants' conspiratorial efforts to artificially reduce supply and raise prices of chicken sold in the United States.

### G.      The Statute of Limitations Does Not Bar Plaintiff's Claims

#### (i)   Plaintiff Did Not Discover (and Could Not Have Discovered) the Conspiracy Until 2016

342.    Plaintiff had neither actual nor constructive knowledge of the facts constituting its claims for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until approximately 2016. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiff on inquiry notice that there was a conspiracy to fix prices for chickens.

343.    With respect to the output-restriction element of Defendants' conspiracy, Plaintiff did not discover, nor could have discovered through the exercise of reasonable diligence, the facts supporting its claims for relief, until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Koch Foods, Inc. et al.*, in this District in September 2016. The filing of the

*Maplevale Farms* complaint, which alleges a class of which Plaintiff is an absent member, caused Plaintiff and its counsel to start an investigation into the facts alleged in this Complaint.

344.    With respect to the manipulation of the Georgia Dock, a January 18, 2016 WALL STREET JOURNAL article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock.    Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.

345.    Yet even when faced with these public revelations, Defendants and their co-conspirators continued to assert the fairness and accuracy of the Georgia Dock benchmark price. For example, in a November 8, 2016, WASHINGTON POST article, co-conspirator Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," so as to induce purchasers of chickens to believe the benchmark price was not subject to unlawful manipulation by the Georgia Dock Conspirators.  Not until November 10, 2016, was it disclosed publicly that the Georgia Dock Conspirators had formed a secret Georgia Dock Advisory Board that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price.  The existence of this Board was not known to Plaintiff, nor would it have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Board meetings.  Not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Conspirators.

346. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiff reasonably considered the U.S. chicken industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

347. Plaintiff exercised reasonable diligence. Plaintiff could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.

(ii)    Defendants Actively Concealed Their Conspiracy

348. Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

349. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, e-mails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

350. Defendants and their co-conspirators used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other in furtherance of their conspiracy to restrain production while shielding their conspiracy from

111

detection or suspicion.  As alleged above, specific examples of the use of such coded language include, without limitation:  (1) the National Chicken Council's Annual Conference in October 2011 where a report reflected that panel members Clint Rivers (then of Perdue) and Mark Kaminsky of Koch Foods noted that "[d]iscipline on the supply side was one suggestion" to increase chicken prices; (2) on a May 3, 2013, earnings call, Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply continues to be disciplined and constrained … and "we've done a good job so far of maintaining discipline;" and (3) on a July 2016 earnings call Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

351.    As alleged above, in 2008, after years of boom and bust cycles of production leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly steady increase that continued at least through 2016.  Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs.  Defendants used these pretexts to cover up the conspiracy.  In fact, the chicken price increases were the result of Defendants' collusive conduct, which was undisclosed at the time.

352.    During the relevant period, Defendants affirmatively made numerous misleading public statements falsely portraying the market for chickens as a competitive one.  For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

353.    To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including:  (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an Avian Flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico.   These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases on these factors rather than Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).

354.    Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and increase prices.  For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases.  However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.  Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices.  Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs.  Defendants made all of these pretextual representations to conceal their conspiracy and avoid disclosing their agreement to unlawfully restrain the supply of chickens.

355.    By virtue of Defendants actively and purposefully concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and

continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from Defendants' and Agri Stats' unlawful combination and conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.

> (iii) Plaintiff's Claims Were Tolled by the Direct Purchaser Class Action Complaint Filed in 2016

356.    Plaintiff was a member of the direct purchaser class action complaint asserted against Defendants, including, but not limited to *Maplevale Farms, Inc. v. Koch Foods, Inc., et al.*, No. 1:16-cv-08637 (Dkt. No. 1) (N.D. Ill. Sept. 2, 2016).  Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.

## VI.  **ANTITRUST IMPACT**

357.    Defendants' conspiracy had the following effects, among others:

- Price competition has been restrained or eliminated with respect to Broilers;

- The prices of Broilers have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

- Direct purchasers of Broilers have been deprived of free and open competition among Defendants.

358.    During the relevant period, Plaintiff purchased chicken directly from several of the Defendants (and their affiliates).  As a direct and proximate result of Defendants' above-described illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for chickens.

359.    As a direct and proximate consequence of Defendants' and their co-conspirators' (including Agri Stats) above-described wrongful conduct, Plaintiff sustained substantial losses and damage to its businesses and property in the form of overcharges for chickens.  The full

amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

## VII.  VIOLATION OF THE SHERMAN ACT

**COUNT I**
**VIOLATION OF 15 U.S.C. § 1**
**(AGAINST ALL DEFENDANTS FOR OUTPUT RESTRICTION AND PRICE-FIXING)**

360.    Plaintiff realleges and incorporates Paragraphs 1 – 359 of this Complaint as though fully set forth herein.

361.    Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

362.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

363.    At least as early as January 1, 2008, and continuing until at least as late as 2016, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Broilers, thereby creating anticompetitive effects.

364.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Broilers throughout the United States.

365.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

366.    As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supra-competitive prices for Broilers.

367. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

- Price competition in the market for Broilers has been restrained, suppressed, and/or eliminated in the United States;

- Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Plaintiff, which directly purchased Broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, has been deprived of the benefits of free and open competition in the purchase of Broilers.

368. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices would increase other Broiler market prices, including those paid by Plaintiff.

369. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by paying more for Broilers purchased directly from Defendants and their co-conspirators than it would have paid and will pay in the absence of the conspiracy.

370. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

**COUNT II**
**VIOLATION OF 15 U.S.C. § 1**
**(AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTION – PLED IN THE ALTERNATIVE TO COUNT I)**

371.    Plaintiff realleges and incorporates Paragraphs 1 – 359 of this Complaint as though fully set forth herein.

372.    In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

373.    Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States:  (1) prices charged to, and paid by, Plaintiff for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

374.    Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

375.    As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiff paid artificially inflated prices for chicken.

376.    As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiff was damaged in its businesses or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**COUNT III**
**VIOLATION OF 15 U.S.C. § 1**
**(AGAINST DEFENDANTS PILGRIM'S PRIDE, TYSON, PERDUE & MAR-JAC**
**FOR PRICE-FIXING – PLED IN THE ALTERNATIVE TO COUNT I)**

377.    Plaintiff realleges and incorporates Paragraphs 1 – 359 of this Complaint as though fully set forth herein.

378.    In knowingly coordinating, falsifying, and manipulating prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index for the intended unlawful purpose of fixing, maintaining, raising, and stabilizing the price of Broilers sold in the United States, Defendants  Pilgrim's Pride, Tyson, Perdue, Mar-Jac (referred to in Count III only, as "the Georgia Dock Defendants") engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

379.    Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States:  (1) prices charged to, and paid by, Plaintiff, directly and indirectly, for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.

380.    The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

381.    As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, Plaintiff paid artificially inflated prices for chicken.

382.    As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, Plaintiff was damaged in its businesses or property by paying prices for chicken that were higher than they would have been but for the Georgia Dock

Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Enter joint and several judgments against Defendants in favor of Plaintiff;

B.  Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under federal antitrust laws, and enter a joint and several judgment in favor of Plaintiff against Defendants in an amount to be trebled to the extent such laws permit;

C.  Award Plaintiff its post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

D.  Award Plaintiff its attorneys' fees, litigation expenses, and costs, as provided by law; and

E.  Grant Plaintiff such other and further relief that the Court may deem just and proper.

### **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 18, 2019                     Respectfully submitted,

CARLTON FIELDS JORDEN BURT, P.A.

By:   */s/ Kristin A. Gore*
David B. Esau
Sarah Cortvriend
Kristin A. Gore
Amanda R. Jesteadt

119

525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401
Tel: (561) 659-7070
Fax: (561) 659-7368
desau@carltonfields.com
scortvriend@carltonfields.com
kgore@carltonfields.com
ajesteadt@carltonfields.com

*Counsel for Hooters of America, LLC*

Joseph M. Vanek
Michael G. Dickler
Sperling & Slater, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
mdickler@sperling-law.com

*Designated Local Counsel for Plaintiff under N.D.
Ill. LR 83.15*